157 So. 534

**TROPICAL PRINTING CO., Inc., v. UNION TITLE GUARANTEE CO., Inc.**

No. 32791.

Oct. 2, 1934.

Rehearing Denied Oct. 29, 1934.

Isaac S. Heller, Max M. Schaumburger, and Leopold Stahl, all of New Orleans, for appellants Mortgage Corporation et al. and Mrs. Emile Hirsch.

Dufour, St. Paul, Levy & Miceli and Philip E. James, all of New Orleans, for appellant Reconstruction Finance Corporation.

Theo. Cotonio, Jr., and Theo. Cotonio, both of New Orleans, for appellant John Foto.

Titche & Titche, of New Orleans, for appellant Mrs. Delphine F. Levy.

Benjamin Y. Wolf, of New Orleans, for appellant Adam Wirth.

L. D. Dunbar, of New Orleans, for appellant Joseph C. Meyers.

Dart & Dart, of New Orleans (L. C. Guidry, of New Orleans, of counsel), for appellants American Nat. Ins. Co., Lafayette Fire Ins. Co., and Mertie M. Bloom.

Nat W. Bond, City Atty., and Walter M. Barnett, Jr., and Howard W. Lenfant, Asst. City Attys., all of New Orleans, for appellant City of New Orleans.

Herbert W. Kaiser and John H. Hammel, Jr., both of New Orleans, for appellees Peat, Marwick, Mitchell & Co. and Emile Bienvenu.

Charles J. Rivet, of New Orleans, for appellee John J. Maxwell.

Rene A. Viosca, U. S. Atty., William H. Norman, Sp. Asst. to U. S. Atty., and Robert Weinstein, Asst. U. S. Atty., all of New Orleans, for appellee United States of America.

J. C. Henriques and Rosen, Kammer, Wolff & Farrar, all of New Orleans, for receivers, Clay W. Beckner and S. Sanford Levy.

Pierre D. Oliver, appellee, in pro. per.

O'NIELL, Chief Justice.

The receivers of the Union Title Guarantee Company, Inc., who were appointed on the 6th of January, 1933, filed what they called their first provisional account and tableau of

distribution on the 24th of October, 1933. The account consists of a voluminous audit of the books of the insolvent corporation, a list and valuation of the property on hand, a statement and classification of the funds held by the receivers, including collections made after their appointment, and a list and classification of the claims against the corporation.

The company's business was that of making loans secured by mortgages on real estate and selling the mortgage notes, under a guaranty, not only that the title of the mortgaged property was valid, but also that the notes would be paid at maturity. Every mortgage note so received and disposed of by the corporation contained this stipulation:

"Principal and interest of this note are payable solely at the office of Union Title Guarantee Company, Inc., New Orleans, La."

The acts of mortgage securing the payment of the notes contained these clauses:

"The principal and interest of the above note shall be payable solely at the office of the said Union Title Guarantee Company, Inc., in the city of New Orleans. The deposit by the mortgagor with said company in cash of the amount necessary to pay the principal and interest (and such other amounts, if any, as may be due to the holder or holders of said mortgage notes in accordance herewith) shall constitute full payment as between the mortgagor and the holder or holders of said notes.

"The holder or holders of said notes shall not be entitled to receive interest on the moneys deposited with the said Company. Upon such deposit being made, the holder or holders of said notes shall be excluded from the lien of this mortgage and shall look for the payment of principal and interest and other amounts which may be due only to the funds so deposited with the said Company and in no event to the mortgagor; but the said moneys so deposited with said Company shall be paid by said Company to the holder or holders of said notes, respectively, upon the presentation of said notes, either for cancellation or for notation of partial payment thereon, as the case may be. And, upon the demand of the mortgagor, said Company shall be and it is hereby authorized to execute a partial release of the mortgage to the extent of the payment so made by said mortgagor to said Company, as herein authorized."

For a period of nearly ten years after the corporation was organized, or until the 24th of June, 1932, all sums of money deposited with the company by note makers, to be paid to the holders of their notes, were simply credited to the account of the note holders and deposited in the company's bank account, to be paid over on demand of the note holders for whom the money was collected. But, on the 24th of June, 1932, the officers of the company, perhaps having come to realize that the funds which were deposited by note makers with the company as agent for the note holders did not belong to the company and should not be mingled with the company's funds, or dealt with as such, opened a bank account, labeled, "Trustee Account," which was kept entirely separate and apart from the company's bank account; and into this so-called trustee account the company then deposited exactly the amount which the company had collected and was holding for account of note holders. Thenceforth the company maintained the trustee account, representing

the money that had been collected for and belonged to note holders. As a rule, all sums deposited by note makers for account of the holders of their notes were deposited directly and immediately into the trustee account; but sometimes these deposits were first placed into the company's bank account and afterwards transferred to the trustee account. A month after the account was opened, the company borrowed $6,000 from the account, but returned it to the account five days afterwards. Four months later the company made a loan of $10,000 of the funds in the trustee account to the Union Indemnity Company, a corporation affiliated with the Union Title Guarantee Company; and, a week later, the Union Title Guarantee Company made another loan of $10,000 of the funds in the trustee account to the ·Union Indemnity Company. Eighteen days afterwards the Union Indemnity Company paid the two loans, and the $20,-000 was redeposited by the Union Title Guarantee Company immediately into the trustee account. These loans to the Union Indemnity Company were intended to be only temporary transactions, to accommodate the borrower pending the consummation of a loan of $20,-000 from the Reconstruction Finance Corporation, which loan was in fact consummated. A few days later, that is, on the 5th of January, 1933, the Union Title Guarantee borrowed $15,600 from the· Union Indemnity Company and immediately deposited the amount into the trustee account. It required exactly that sum to cover certain sums which had been deposited by note makers with the Union Title Guarantee Company, as agent for the note holders, and which had not yet been placed into the trustee account. After the $15,600 was placed into the trustee account, it contained nothing more than had been deposited by note makers with the Union Title Guarantee Company, as agent for the holders of their notes.

At the time when the receivers were appointed, there was in the trustee account the sum of $53,724.84, and in the company's bank account $10,694.61. The receivers afterwards received from note makers deposits for account of the holders of their notes, which deposits, of course, were in the same category as the funds in the trustee account.

Thus the receivers had on hand when they filed their provisional account $69,705.60, including the funds in the trustee account, and including also the sums that were deposited by note makers with the receivers for account of note holders; and the receivers proposed, in their petition for approval of their provisional account, to distribute the $69,705.60, thus:

1. To return to the note makers the sums received from them by the receivers for account of note holders ................ $ 7,614.41
2. To pay to the note holders (less 10 per cent. to be reserved for costs of administration) the sums deposited with the corporation by note makers for account of the holders of their notes and placed by the corporation directly into the trustee account ..................... $20,931.99
3. To set aside for court costs and miscellaneous expenses ...... $ 664.20

4. To pay to the receivers, in part payment of their fee of $15,-000.00 ..................... $10,500.00

5. To pay to the attorneys for the receivers, in part payment of their fee of $10,000.00 ....... $ 7,000.00

6. To pay to the notary public, on account of his fee of $5,000.00, for making the inventory .... $ 3,500.00

7. To pay to the two appraisers $1,-750.00 each, on account of their fees of $2,500.00 each ........ $ 3,500.00

8. To pay to. the auditors, in part payment of their charges of $22,850.00 ................... $15,995.00

Total amount to be disbursed $69,705.60

The receivers proposed also to disburse the money thereafter coming into their hands, from sales of the property of the corporation, thus: First, to pay the balance of the fees of the receivers, their attorneys, the notaries, appraisers, and auditors, $17,355.00; second, to pay any additional fees that might be allowed the receivers or their attorneys; third, to pay the income taxes due to the United States, amounting to $26,935.68; and, fourth, to pay the state and city taxes· assessed against the property of the corporation, the amount of which was not determinable at that time.

The city of New Orleans filed an opposition to the account, and obtained a rule on the receivers (according to the provisions of section 49 of Act No. 170 of 1898) to show cause why they should not pay the municipal taxes assessed against the personal property of the corporation for 1932 and 1933, amounting to $3,055.26.

Many of the note holders, thirty or more, whose money had been collected from the note makers, either by the corporation or by the receivers, also opposed the provisional account and the proposed method of distribution, claiming that the fund in the trustee account, as well as the funds paid by note makers to the receivers for account of note holders, belonged to them, the note holders, and should be paid to them without deduction of any costs or imposition of any taxes assessed against the corporation.

The United States did not oppose the provisional account or the proposed method of distribution; and on the trial of oppositions to the account it.was admitted by all parties that the amount of income taxes claimed by the United States was correct. The only opponent of the claim of the United States for income taxes is the city of New Orleans, claiming that the municipal taxes on the personal property of the corporation should be paid in preference to .the claim of the United States.

The filing of the receivers' provisional account, and of their proposed method of distribution of the funds on hand, was duly published, and, as far as the account was not opposed, it was homologated. On the trial of the oppositions to the account, every opponent abandoned his complaint of the amount of the fees proposed to be paid to the receivers, to their attorneys, to the notary public, to the appraisers, and to the auditors. After a trial which lasted two weeks, the judge rejected the proposed method of distribution of the $69,705.60, as submitted by the receivers, and gave judgment as follows:

First. It was held that the $53,724.84, which was in the trustee account at the time when the receivers were appointed, should not be paid to the note holders, for whose account it had been deposited by the note makers, but should be dealt with as an asset of the insolvent corporation, and distributed among its creditors. Hence, the receivers were ordered to take off of their provisional account the item of $20,931.99, which had been deposited with the corporation by note makers and placed directly into the trustee account, as the property of the holders of the mortgage notes which were to be thereby paid, either wholly or in part.

Second. It was held that the money which had been deposited with the receivers by note makers, to be paid to the holders of their mortgage notes, and which the receivers proposed to return to the note makers who had deposited the money, should be paid to the note holders, for whom it was deposited, instead of being returned to the depositors.

Third. The fees claimed by the receivers, their attorneys, the notary public, the appraisers, and the auditors—all opposition to which fees having been withdrawn—were approved.

Fourth. The claim of the city of New Orleans, for taxes on the personal property of the corporation, was held to be subordinate to the claim of the United States, for income taxes owed by the corporation, and the claim of the United States was held to be subordinate to the costs of administering the insolvent estate, such as the fees of the receivers, their attorneys, etc.

Fifth. The receivers were ordered to recast their provisional account so as to distribute the $69,705.60, then in their hands, thus: First, to pay over to the note holders (named in the judgment), without any deduction or reservation whatever, the sums which were deposited with the receivers, by note makers, for account of the note holders, and which amounted to $9,896.03; second, to pay in full the fees of the receivers, $15,000, the fees of their attorneys, $10,000, the fee of the notary public for making the inventory, $5,000, the fees of the appraisers, $5,000, and the charges of the auditors, $22,850; and, third, to pay the remaining $1,959.57 to the United States, in part payment of the income taxes owed by the insolvent corporation, amounting to $26,935.68, plus interest.

The note holders, for whose account the $53,724.84 was deposited into the trustee account, have appealed from the decision. Several note holders for whose account the note makers deposited with the corporation sums which were not placed in the trustee account by the corporation, also, have appealed. The city of New Orleans also has appealed.

It is not disputed that the judgment ordering the receivers to pay to the note holders, instead of returning to the depositors, the money deposited with the receivers by note makers to be paid to the holders of their notes, is correct.

As we have said, there is no complaint of the fees allowed to the receivers, their attorneys, the notary public, the appraisers, or the auditors.

■■ The first question to be considered is whether the funds in the trustee account belong to the note holders for whose account the funds were deposited by the makers of

the notes, or belong to the insolvent corporation. It is admitted that the corporation is so thoroughly insolvent that these note holders, whose money was deposited with the corporation as their agent, by the makers of the notes, will receive nothing from the receivers in the settlement of the affairs of the corporation, if the receivers must deal with the funds in the trustee account as belonging to the insolvent corporation, or to its creditors generally, as the judge has held. He made no distinction between the money that was deposited directly into the trustee account when the money was received from the note makers, and the money that was first deposited into the corporation's own bank account and afterwards transferred to the trustee account, to the credit of the note holders, where it belonged. The judge, therefore, ordered the receivers to take off of their account, and to transfer to the credit of the insolvent corporation, the items which the receivers proposed to pay to the note holders, respectively, and which the makers of the notes, respectively, had deposited with the corporation as agent for the holders of the notes, and which the corporation had deposited immediately and directly into the trustee account, to the credit of the note holders, respectively. The receivers, in their brief, say that, although they believed when they filed their account that these funds which were deposited directly and immediately into the trustee account should be paid over to the note holders for whose account the money was deposited, they, the receivers, have concluded now that the judge was right in ordering them to deal with these funds as funds of the insolvent corporation. ·

We concur in the opinion that there is no difference, as far as the corporation's claim of ownership of these funds is concerned, between the funds that were deposited directly into the trustee account and the funds that were first deposited into the corporation's bank account and afterwards transferred to the trustee account, where the funds belonged. An agent who receives money to be deposited for his principal in a separate bank account, so labeled that it can be identified as belonging to his principal, cannot acquire or affect the ownership of the money, or of the deposit, by first depositing the money into his, the agent's, bank account, and afterwards transferring the same amount of money into a deposit so labeled that it can be identified as belonging to the principal. The principal's right in such a case is not merely a lien on the fund, or on the deposit, but is ownership of it. The agent in such a case is not the debtor but the trustee of the principal; and the relation of principal and agent cannot be converted into that of creditor and debtor, by the agent's unauthorized act of temporarily converting to his own use money deposited with him for delivery to his principal, and afterwards deposited by the agent for account of his principal. McDonogh v. Delassus, 10 Rob. 481. If the principal can identify his property *or its proceeds* in the hands of his agent, the principal is entitled to it. L'Hommedieu v. Penny's Executors, 6 La. 599; Whatley v. Austin, 1 Rob. 21 (obiter); Stetson, Avery & Co. v. Gurney, 17 La. 162; Bloodworth v. Jacobs, 2 La. Ann. 24; Beatty v. McCleod, 11 La. Ann. 76.

The receivers contend that the fund on deposit in the trustee account lost its iden-

tity, as the property of the note holders for whose account it was deposited, and became mingled with the funds of the insolvent corporation, by the corporation's borrowing and lending a part of the fund, and afterwards depositing other money in the trustee account to cover the deficit. But we do not see why that should affect the title to the fund on deposit in the so-called trustee account. The important fact is that no money belonging to the corporation, or to be expended for the corporation or for any one except the note holders who owned the money in the trustee account, was ever deposited in that account, or mingled with the funds in that account. It seems to be conceded by the receivers that the corporation, being merely the agent of the note holders whose money was deposited with the corporation by the note makers, had no right to use or to borrow or lend any of the money which the corporation deposited in the trustee account. But that is a matter of no importance, as the court explained in the case which we have just cited, Beatty v. McCleod, 11 La. Ann. 76. In that case, a tutor, without authority so to do, discounted a promissory note belonging to his ward, and converted the money to his own use, and, afterwards, when fatally ill, deposited with a friend, for delivery to the ward, a sum of money less than the proceeds of the note which he had discounted, and told the friend that the money belonged to the ward. After the death of the tutor, his creditors claimed that the money which he had deposited with his friend for delivery to his ward could not be identified as the proceeds of the sale of her promissory note, and therefore belonged to the succession of the tutor and should be dis-

tributed among his creditors generally. But Chief Justice Merrick, for the court, expressed the idea which we have in mind now, thus:

"As by law the tutor ought not to use the funds of his ward, and as he has the right to deposit such funds in bank in his name as tutor, or to keep them distinct from his own by proper labels, we can see no good reason why, on an occasion like the present, he might not deposit the money with some trusty person for safe keeping.

"We do not see any force in the argument that the tutor has converted the notes into cash, and therefore made the proceeds his money. If the tutor has wronged the minor by discounting the paper belonging to her, it is no reason why she should be further wronged by giving the proceeds to the creditors of her father."

All of these cases, which we have cited, were referred to with approval in Succession of Boisblanc, 32 La. Ann. 109, where the court, on page 113, expressed its conclusion thus:

"We know of no process by which the agent can become the owner of the money or the property of his principal, intrusted to him for a special purpose. The unfaithful or imprudent agent may so deal with the property of the principal as to subject it to the rights of his creditors [meaning subject it to the danger of being seized or claimed by his creditors] or other innocent third persons: he may make the tracing and identification of it, and the proof of ownership difficult, even impossible: he may illegally convert it to his own uses, and subject himself to criminal prosecution, under the statute, for embezzle-

ment or breach of trust with respect to it; but he cannot, as against his principal, make it his own, nor can he transmit it to his succession by will, or ab intestate."

In Succession of Boisblanc, from which we have just quoted, the court explained the decision in Longbottom's Executors v. Babcock, 9 La. 44, which the receivers rely upon in the present case. In Succession of Boisblanc the court said:

"Two decisions of this court are relied upon in support of the claim of the administrator: Longbottom's Executors v. Babcock, 9 La. 44, and Stetson & Avery v. Gurney, 17 La. 162. In the first case, Henry had given to his attorney in fact, Longbottom, a check for $1,300, to be disbursed for his account, of which Longbottom had disbursed $200. After the death of Longbottom, $1,100 in money were found in his store; and Henry claimed that this sum was the balance of the money deposited by him with Longbottom, and that he was entitled to it, by preference, out of the funds of the succession. *It does not appear what length of time elapsed between the giving of the check and the death of Longbottom, nor whence the money came which was found in his store.* The court said: 'There is no evidence to show that this sum is the same money received by the testator;' and Henry was ranked as an ordinary creditor for the balance due him." (The italics are ours.)

We have italicized that part of the statement of facts from which it may be inferred that the Longbottom Case would have been decided the other way if the $1,100 found in Longbottom's store had been so deposited or labeled as to be identified as representing what was left of the proceeds of the check for $1,300 which Henry had deposited with Longbottom. The Longbottom Case, therefore, is not at all like the case before us.

Two other decisions which the receivers rely upon to support their argument that the fund in the trustee account became mingled with the funds of the insolvent corporation, and that the title to the fund in the trustee account thereby passed from the note holders to the insolvent corporation, are Young v. Teutonia Bank & Trust Co., 134 La. 879, 64 So. 806, and Sabine Canal Co. v. Crowley Trust & Savings Bank, 164 La. 33, 113 So. 754, which arose before the enactment of Act No. 63 of 1926, p. 79. The difference between those cases (which were similar to Longbottom's Executors v. Babcock) is that, in those cases the money that was received by the agent for account of the principal was retained by the agent as a part of his own funds, and remained mingled therewith, so as to make the agent a debtor for the amount to be remitted to the principal; whereas, in the present case, the funds which the agent of the note holders received for their account were not kept in the vault or bank account of the agent, mingled with funds belonging to the agent, but were deposited in another institution—a chartered bank—where the deposit retained its identity as the property of the note holders, for whose account it was established. The fact that the agent, in some instances, did not deposit into the trustee account the same money—the same currency or coin or representative of the money—which the agent received from the note makers for account of the holders of their notes—but

first placed the money in the agent's bank account and afterwards transferred the same amount of money to the trustee account—is a matter of no importance—according to the decisions which have been cited on the subject.

█ It is contended by the receivers that the stipulations which we have quoted from the promissory notes and the acts of mortgage did not oblige the Union Title Guarantee Company to keep a separate bank account or deposit of the funds deposited by note makers, with the corporation, as agent for the note holders. But our opinion is that the stipulations which we have quoted did impose that obligation upon the Union Title Guarantee Company. In the first place, the stipulation in the notes themselves, as well as in the acts of mortgage, that the principal and the interest were both payable *solely* at the office of the Union Title Guarantee Company, was the same as to stipulate that there should be no payment or tender of payment to the holders of the notes, and was therefore an unusual stipulation. It is not unusual to stipulate in a promissory note that it is payable at a specified bank or office, leaving it optional with the holder of the note to present it for payment either at the place stipulated or to the maker in person. But a stipulation in a note that it is payable "solely" at the office of a designated third party is very unusual and significant. The additional stipulations in these acts of mortgage leave no doubt that the money deposited by note makers with the corporation, as agent for the note holders, should have been kept separate and apart from the company's funds, and identified as belonging to the note holders,

viz.: (1) That a deposit of the amount due on a mortgage note, by the mortgagor, with the corporation, should discharge the mortgagor from liability; (2) that the holder of a mortgage note should not be entitled to interest on the money so deposited, after the making of the deposit; (3) that the deposit should have the effect of releasing the mortgage or lien; (4) that the holder of the mortgage note should look *only to the funds so deposited with the company,* "and in no event to the mortgagor"; and (5) that the company had authority to release the mortgage to the extent of a payment so made. As the corporation—and no one else—could receive a payment due on the mortgage note, and could release the mortgage to the extent of the amount received, the holder of the mortgage note or notes had no security whatever, except the financial responsibility of the Union Title Guarantee Company, if the company was not obliged to keep the note holders' money separate and apart from its own funds.

It appears that, among the note holders who are opposing the receivers' provisional account are some who have mortgages on property in Texas, Mississippi, or Alabama, and that the mortgages which were taken on lands in those states did not contain all of the stipulations which we have quoted from the Louisiana mortgages. But it is admitted that the mortgages which the company dealt in on lands in Texas, Mississippi, or Alabama were subject to the same stipulations that were made in the Louisiana mortgages, with regard to payment being made *solely* at the office of the Union Title Guarantee Company.

█ Our conclusion on this subject, therefore, is that the funds in the trustee account,

whether deposited there directly when received or subsequently, and the funds deposited with the receivers by note makers, for payment to the holders of their notes, belong to the holders of the notes, and must be paid to them, respectively, without any deduction for costs of administration or for taxes assessed against the corporation.

■ It appears that an appeal was taken by or on behalf of several note holders who did not oppose the provisional account because their ownership of their share of the funds in the trustee account was recognized by the receivers, though it was subjected to a contribution of 10 per cent. of the costs of administration. We maintain that these note holders had a right to appeal from the judgment which ordered the account amended to their prejudice; but they cannot successfully complain of the deduction of 10 per cent. of their claims for costs of administration, because that matter was foreclosed by the judgment homologating the account in so far as it was not opposed, from which judgment no appeal was taken.

The Reconstruction Finance Corporation also, as appellant, does not complain of the proposed deduction from the amounts deposited to pay notes held by the appellant, of 10 per cent. for costs of administration. In every instance where money was deposited to pay a note held by the Reconstruction Finance Corporation the money was deposited directly and immediately into the trustee account; and, as the receivers proposed to pay to the note holders the funds so deposited, less the deduction of 10 per cent. for costs of administration, the Reconstruction Finance Corporation did not oppose the deduction of the 10 per cent.

As to the appeal of Adams Wirth and Mrs. Delphine F. Levy, it appears that they hold two mortgage notes for $1,000 each and one for $500, which the Union Title Guarantee Company acquired from the Redersheimer Realty & Investment Corporation and sold to Adams Wirth and Mrs. Levy. The total sum of the notes secured by the Redersheimer mortgage was $25,000. Between the 9th of April and the 8th of July, 1932, the Redersheimer Corporation deposited with the Union Title Guarantee Company $3,566.50 to cover principal and interest on their notes and taxes on the mortgaged property. These sums were deposited by the company into its own bank account; but, on the 4th of January, 1933, the company transferred to the trustee account $7,729.85, which covered certain specified sums which had been deposited by note makers for account of note holders, including the money which the Redersheimer Corporation had deposited, and which belonged in the trustee account. For the reasons which we have already given on this subject, Adams Wirth and Mrs. Levy, as holders of the Redersheimer notes, are entitled to their proportionate share of the amount deposited by the Redersheimer Corporation and finally placed into the trustee account.

■ The American National Insurance Company, one of the appellants, holds several mortgage notes which were acquired by the company from several mortgagors, namely, Charles Handleman, Universal Realty Company, Arthur Duvic, A. E. Massey, and a corporation styled Tharp, Sontheimer, Tharp,

Inc. The claim on the Massey note is abandoned because it developed on the trial of this case that Massey had made no deposit with the company. Handleman deposited with the company, on the 3d of January, 1933, $575, to pay $75 interest and $500 principal due on one of his notes, which the company deposited into its own bank account. It appears that this money was never transferred to the trustee account where it belonged. If that is true, the claim is governed by the decisions in the Longbottom Case, the Teutonia Bank Case, and the Sabine Canal Case. If we are mistaken as to this fact, and if the money was transferred to the trustee account, the holder of the Handleman note, for whose account the money was deposited, is entitled to it, for the reasons which we have given. As to the notes of the Universal Realty Company, it appears that the company deposited with the Union Title Guarantee Company, on the 4th of January, 1933, the sum of $285, which, however, the company placed into its own bank account and did not transfer to the trustee account. The claim, therefore, is to be disposed of like the Handleman claim. As to the Arthur Duvic notes, however, it appears that he deposited $700 on the 5th of January, 1933, for payment on his notes, and the company deposited the amount into the trustee account; hence the receivers proposed to pay the $700 to the holder of the Duvic notes, less 10 per cent. for costs of administration. If the account in that respect was homologated without opposition, or if there is no protest against the deduction of 10 per cent., the holder of the Duvic notes is entitled to the $630; otherwise the holder of these notes is entitled to the $700. These questions of fact that are

undecided or in doubt may be determined when the case is remanded for further proceedings, which, of course, will be necessary. As to the notes of Tharp, Sontheimer, Tharp, Inc., it appears that the company deposited on the 3d of January, 1933, $1,845, for the payment of interest on the notes, which, however, the company deposited in its own bank account and did not transfer to the trustee account. If this money was not transferred to the trustee account, the claim is within the doctrine of the Longbottom Case, the Teutonia Bank Case, and the Sabine Canal Case. If the money was transferred to the trustee account, and is yet included in the amount found in that account, it belongs to the holder of the Tharp, Sontheimer, Tharp notes.

The Lafayette Fire Insurance Company, appellant, holds an issue of mortgage notes which the company acquired from Mrs. F. W. Kuntz, as, mortgagor, and on which she deposited $72 for the interest due on the notes. As it appears that the $72 was deposited into the trustee account, the claim is to be disposed of like the claim of the American National Insurance Company on the deposit of $700 by Arthur Duvic. The Lafayette Fire Insurance Company holds also notes received by the company from G. D. Schneidau and Miss Julia E. Schneidau, on one of which notes G. D. Schneidau deposited with the company $100 for payment on one of the notes; but it appears that the $100 was deposited by the company in its own bank account and was not transferred to the trustee account. The claim is to be disposed of, therefore, like that of the American Life Insurance Company on the Handleman deposit of $575, and on the Universal Realty Company's deposit of $285.

■ There is a claim on the part of John Foto for $300, which he deposited with the company for payment to the holders of four notes amounting to $1,000, and which the company deposited directly into the trustee account, where it belonged. The receivers proposed to pay to Foto (who obtained an assignment from the holders of the notes) $270, reserving the remaining $30 for costs of administration. As Foto opposed the account in so far as the $30 was concerned, it is conceded by the receivers that, if we maintain that the money in the trustee account belonged to the note holders for whose account it was deposited, the only question in Foto's case is whether he should contribute the $30 for costs of administration. As the money belonged to Foto, and not to the insolvent corporation, there is no reason why the money should be taxed for the costs of administration. It is said in some of the supplemental briefs in this case that the receivers have collected considerable sums of money for sales of property of the corporation since the provisional account was filed, and that there is now in their hands a sum sufficient to pay the costs of administration, and all taxes assessed against the corporation, without going into the trustee account, or into the money collected by the receivers from note makers for account of the holders of their notes. If that is true, Foto's complaint, and perhaps many others, will present only moot questions.

As to the claim of J. Floyd Hodge, although he owns only $\frac{9}{15}$ of a series of notes called the Farenbacher notes, the sum of $999.07 deposited by Farenbacher was deposited solely for the payment of the notes held by Hodge. Of the amount so deposited by Farenbacher, $749.07 went directly into the trustee account and $250 was first deposited by the company into its own bank account and was afterwards transferred to the trustee account. Hodge is therefore entitled to receive the $999.07.

■ The claim of one of the appellants, Joseph C. Meyers, seems to depend upon the question of fact, whether a certain deposit of $1,000 made by Antonio and Frank Granna, on the 3d of January, 1933, to pay a mortgage note made by them and held by Meyers, due on the 1st of January, 1933, was deposited by the corporation into the trustee account, where it belonged. Meyers had left the note with the company for collection on the 2d of January, and the company surrendered the note to the Grannas on the 3d of January, when they paid the $1,000. On the next day, the 4th of January, the company drew a check on its own bank account, for the $1,000, payable to Meyers. It seems that the $1,000 was, perhaps inadvertently, placed in the company's bank account, instead of being deposited in the trustee account, where it belonged. The check for $1,000, which the company had made payable to Meyers was, for some unexplained reason, but perhaps because the deposit of $1,000 had been transferred to the trustee account, not delivered to Meyers but was canceled by the company, and on the 5th of January a check for the same amount was drawn on the trustee account, payable to Meyers. He presented the check for payment promptly, on the morning of January 6th, at the opening of the bank on which the check was drawn, and where the trustee account was kept; but the bank refused to pay the check, for the reason only that the bank had been informed that the

Union Title Guarantee Company was about to go into the hands of a receiver, which event did in fact occur that day. It is argued on behalf of Meyers that the fact that the company canceled, without delivering, the check of $1,000 which was made payable to Meyers, and that the company drew a new check and delivered it to Meyers, for the same amount, but drawn on the trustee account, is sufficient evidence that the deposit of $1,000 for which the check was drawn was transferred to the trustee account, where it belonged. We concur in that finding, and agree that the $1,000 must be paid to Meyers out of the trustee account, unless, on the remand of this case, it is shown that there is a deficit of $1,000 in the trustee account and that the deficit is accounted for only by a failure of the company to place or transfer the Granna deposit of $1,000 into the trustee account.

Joseph C. Meyers has six other claims, amounting to $723.33, each one of which is in one or another of the classifications which we have already made. For instance, of the claim of $90, based upon the deposit made by Joseph Mascari, to pay a note held by Meyers, $20 was deposited directly into the trustee account and $70 was paid after the receivers were appointed. Meyers is therefore entitled to the $90. His claim of $528.33, for a deposit made by Catherine L. Peters to pay her note held by Meyers, was placed directly into the trustee account; hence Meyers is entitled to the amount. The claim of $30 for interest on a note of $1,000 made by L. J. Bradley is the proportion due to Meyers of a deposit of $100 that went directly into the trustee account and of a deposit of

$20 made by Bradley after the receivers were appointed. Hence Meyers is entitled to the $30 interest. The claim of $30 for Meyers' share of $285.98 of interest deposited by A. L. Reems is in the same class as on the Bradley note. The claim of $15 for Meyers' share of the deposit of $3,566.50 by the Redersheimer Realty & Investment Company should be paid to Meyers, according to our ruling on the claim of Adam Wirth and Mrs. Levy. Meyers' claim of $30, as his 1/7 share of $210 deposited by J. L. Seidenbach, C. N. Seidenbach, and Mrs. T. S. Seidenbach, to pay interest on their notes, is governed by our ruling on other claims for deposits which did not go into the trustee account, where they belonged, because this deposit of $210 was placed in the company's bank account and was not transferred to the trustee account.

We do not find it necessary to refer specifically to each and every claim that is set up by the several appellants. It is sufficient to say that every claim falls within one or another of the various classifications which we have made in this opinion, and that the receivers can easily determine the classification of each claim in the revising of their account.

The only remaining dispute is in reference to the appeal of the city of New Orleans, claiming that the municipal taxes levied on the personal property of the corporation for the years 1932 and 1933 should be paid in preference to the claim of the United States for income taxes, and without deduction for costs of administration. The city's claim of a preference is founded upon section 49 of Act No. 170 of 1898, which provides that, when a receiver, liquidator, sheriff, or

other court officer takes possession of personal property, he shall pay at once all taxes that may be or become due on the property, and, if he fails so to do, he shall be liable on his bond for the amount. The statute provides that the officer shall file with his account, either provisional or final account, a certificate of the tax collector, showing payment of the taxes, and that in event of a failure to do this he shall not be discharged. The statute provides further that the tax collector may at any time proceed by rule to compel the officer to pay all taxes due on the property, without awaiting the filing of a final account. The city attorney cites and relies upon the decision in Cleveland Steel Co. v. Joe Kaufman Co., 155 La. 529, 99 So. 428, which in turn was cited with approval in Morelock v. Morgan & Bird Gravel Co., 174 La. 658, 141 So. 368, 370. The ruling in those cases was merely, first, that all of the movable property of the delinquent, whether assessed or not assessed, was liable for any taxes due on any of such property, and, second, that the collector had the right to insist upon the payment of the taxes at once "and in preference to all others, out of the personal property of the delinquent," etc. What was meant by "all others" was all others who were then claiming a right to be paid in preference to the tax collector. As the United States was not one of the claimants in either of the cases cited, the decisions there rendered have no application to a claim asserted by the United States under or by virtue of a federal statute. The claim that the United States government is a preferred creditor, in this case, is founded upon section 3466,

U. S. Rev. St., title 31 USCA § 191, and section 3467, U. S. Rev. St., title 31 USCA § 192.

Rev. St. § 3466, title 31 USCA § 191, declares that whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of executors or administrators, is insufficient to pay all of the debts due from the deceased, the debts due to the United States shall be satisfied first. And Rev. St. § 3467, title 31 USCA § 192, provides that any executor, administrator, or assignee, or other person, who pays any debt due by the person or estate from whom or for which he acts, before he pays the debts due to the United States from such person or estate, shall become responsible personally for the debts so due to the United States, or for so much thereof as may remain due and unpaid. The Supreme Court of the United States has held in several cases that, under these laws, debts due to the United States from an insolvent corporation have priority over debts due to a state or to a political corporation, even though the latter debt may be due for taxes. County of Spokane v. United States, 279 U. S. 80, 49 S. Ct. 321, 73 L. Ed. 621; New York v. Maclay, 288 U. S. 290, 53 S. Ct. 323, 77 L. Ed. 754. In the following cases it was held that the word "debts," in section 3466, U. S. Rev. St., 31 USCA § 191, included taxes due to the United States, viz.: Bramwell v. United States Fidelity Co. 269 U. S. 483, 46 S. Ct. 176, 70 L. Ed. 368; Price v. United States, 269 U. S. 492, 46 S. Ct. 180, 70 L. Ed. 373; Stripe v. United States, 269 U. S. 503, 46 S. Ct. 182, 70 L. Ed. 379; and United States v. Butterworth-Judson Corpo-

ration, 269 U. S. 504, 46 S. Ct. 179, 70 L. Ed. 380.

In United States v. Fisher, 2 Cranch, 358, 396, 397, 2 L. Ed. 317, which was cited with approval in Spokane County v. United States, Chief Justice Marshall for the court, gave the reason for the right of the United States government to make any just claim on its part, against an insolvent corporation or a deceased person, superior to a claim of a state, even for taxes, thus:

"This claim of priority on the part of the United States will, it has been said, interfere with the right of the state sovereignties respecting the dignity of debts, and will defeat the measures they have a right to adopt, to secure themselves against delinquencies on the part of their own revenue officers.

"But this is an objection to the constitution itself. The mischief suggested, so far as it can really happen, is the necessary consequence of the supremacy of the laws of the United States on all subjects to which the legislative power of congress extends."

Our conclusion, therefore, is that the claim of the United States for income taxes due from this insolvent corporation is superior in rank to the claim of the city of New Orleans for municipal taxes assessed against the personal property of the corporation.

It is conceded by the United States that, under authority of Union Trust Co. v. Great Eastern Lumber Co. (C. C. A. 5th Circuit) 248 F. 46, and the decisions there cited, the claim of the United States is subordinate to the court costs and costs of administration. We maintain that the claim of the city of New Orleans for taxes is also sub-

ordinate to the court costs and costs of administration. There is nothing in section 49 of Act No. 170 of 1898 to the contrary; and it would be anomalous to hold that the claim of the city of New Orleans, which is subordinate to the claim of the United States, is yet superior to the claim for costs of administration, notwithstanding the claim of the United States is subordinate to the claim for costs of administration.

The appeal taken by the mortgage corporation as agent for Edward Haspel, claiming $407.77 as owner of the notes of Julius J. May, was dismissed on motion of the appellant, concurred in by all parties to the appeal.

### Decree.

The judgment appealed from is set aside, and it is ordered that this case be remanded to the civil district court, division E, for a revision of the receivers' count, according to the opinion which we have expressed, and for all further necessary proceedings, consistent with this opinion. The costs hereof are to be paid out of the funds of the insolvent corporation.

### On Application for Rehearing.

### PER CURIAM.

The receivers have filed a petition for a rehearing, or, in the alternative, for a correction of the judgment heretofore rendered, in two respects, viz.: (1) That the court erred in stating that the amount deposited by the Redersheimer Corporation was $3,566.50, because the amount deposited was in fact only $3,258.33; and (2) that the court erred in re-

fusing to allow the receivers to deduct from the amounts belonging to the note holders, in the trustee account, 10 per cent. for costs of administration.

We find that the amount deposited by the Redersheimer Corporation was $3,258.33. The statement in the opinion which we rendered that the amount so deposited was $3,566.50 was a clerical error, which we now correct.

In support of the contention of the receivers that they should be allowed to deduct 10 per cent. of the note holders' money in the trustee account, for costs of administration, they cite the case entitled In re Immanuel Presbyterian Church, 113 La. 911, 37 So. 873. That case was cited by the receivers in the original brief filed in this case, but we did not refer to it because we did not consider it appropriate. In the case cited the two funds which were required to contribute proportionately to the costs of administration belonged to the corporation whose affairs the receivers had to settle. In this case the fund in the trustee account does not belong to the corporation whose affairs the receivers have to settle. Besides, it appears that there are sufficient funds belonging to the corporation to pay all costs of administration. We adhere to our ruling, therefore, that the note holders who opposed the deduction of 10 per cent. of their money in the trustee account, for costs of administration, shall not be compelled to submit to the deduction.

The city of New Orleans has applied for a rehearing, claiming that the only costs which should be paid in preference to the taxes due to the city are such costs as were necessary for the collection of enough money to pay the taxes due to the city. That is a correct interpretation of section 49 of Act No. 170 of 1898, as far as the statement goes; but, in determining when enough money was collected by the receivers to pay the taxes due to the city, the receivers were obliged to take into consideration that the taxes due to the United States had to be paid before the receivers could pay the taxes due to the city. Our ruling, therefore, is that the taxes due to the city are to be paid out of the money remaining after payment of the taxes due to the United States and such costs as have preference over the claim of the United States, and such costs as were necessary for the collection of enough money to pay also the taxes due to the city. The record does not contain enough information to enable us to segregate the costs in that respect. If the receivers can make such segregation in revising their provisional account, there is nothing to forbid it in the judgment of this court. We make this explanation or correction because the statement made in our original opinion, that the city's claim for taxes was subordinate to the court costs and costs of administration, was perhaps too broad.

Both applications for a rehearing are denied.