## DOWELL, INC., v. SEDBERRY (HUGHES et al., Interveners).

No. 5420.

Court of Appeal of Louisiana. Second Circuit.

April 1, 1937.

Melvin F. Johnson, of Shreveport, for appellant.

Irwin & Cowles, of Shreveport, for appellees.

TALIAFERRO, Judge.

Plaintiff procured judgment against defendant by default for $810, plus interest and attorney's fees, and after the lapse of seven months had execution issued thereon. The First National Bank of. Shreveport was made party garnishee. It admitted that there was on deposit with it to defendant's credit, or checking account, the sum of $1,000. Thereafter, W. F. Hughes and the Big Pine Lumber Company, claiming the ownership of said deposit, intervened. Hughes asserted ownership to $590 of it. In his petition of intervention he avers: "* * * same having been collected by the defendant for the account and benefit of intervenor and having been garnisheed before the defendant had an opportunity to pay the same over to your intervenor." The lumber company, after averring its ownership of the amount claimed by it, says: " * * * the same having been turned over to the defendant by intervenor as garnishee's agent on the distinct understanding and agreement between defendant and intervenor that the said funds would be used in the interest of intervenor only, as intervenor might direct from time to time."

Plaintiff excepted to both interventions on the ground that neither a right nor cause of action was disclosed. The exceptions were overruled. The answers specifically deny that interveners own or are entitled to any part of the deposit. The judgment appealed from by plaintiff recognizes Hughes to be the owner of $412.50 of the deposit and the lumber company as owner of $500 thereof, and maintains the seizure under the garnishment to the extent of $87.50. Said amounts were ordered paid over by the bank in accordance with the judgment.

The facts of these cases are mostly undisputed. We shall state them briefly. Hughes wished to procure some mineral lease protection in the territory west of the city of Shreveport, near Cross Lake, in or about which the Gulf Refining Company had begun or contemplated the assembling of acreage for a drill block. He advanced to Sedberry $250 to pay for leases with the understanding that from the price of the first sale or sales thereof this amount would be reimbursed to him and the remaining cash and/or lease rights would belong to them jointly, three-fourths to Hughes and one-fourth to Sedberry. On March 26, 1936, Sedberry purchased a lease on 20 acres for $40, but had his brother-in-law, Dick Towery, named therein as lessee; and on April 18th, he acquired a lease on 22 acres for $110. This lease was taken in Hughes' name. Sedberry negotiated sales of one-half of the acreage in each lease to the Hunter Company, Incorporated, for $37.50 per acre, or a total of $787.50. He consulted Hughes to ascertain if he was willing to assign the acreage for $25 per acre, to which Hughes assented, thinking that this was the true price of the sales. He was not disillusioned until the interventions were tried. He and Towery executed assignments to the Hunter Company expressing considerations on the basis of $25 per acre; however, checks of $412.50 and $375 to cover the prices of the assignments were issued to Towery who indorsed them, after which they were deposited to the checking account of Sedberry in the bank. The check for $412.50 was deposited June 2, 1936, and that for $375 on June 10, 1936. No part of these deposits was paid over to Hughes prior to service of garnishment process on June 11, 1936. Hughes concedes that he is only entitled to share in the prices of the assignments on the basis of $25 per acre, and that the extra $12.50 per acre belongs to Sedberry.

The Big Pine Lumber Company was incorporated more than a decade ago. For several years prior to 1936 it conducted no business and had no assets. It had not been formally dissolved, but was completely dormant. Subsequent to the discovery of oil in the Rodessa field in the northern part of Caddo parish, it acquired some mineral rights in that territory, and in other respects the corporation was revived and began to function as such. It carried no bank account. Its directors met on May 18, 1936, and some business was transacted. At that time these directors handed to Sedberry $90 in cash. It does not appear that this amount came from company funds, nor does it appear definitely why it was advanced to him. He expended it, seemingly, for his personal needs. He deposited $75 of it to his personal account on May 20th, at which time his account showed a balance of $9.29. On June 2d, when the above-mentioned $412.50 was deposited, there remained to his credit only 84 cents. Even if the $90 had been company funds, a fact the record does not conclusively establish, the question of its ownership while in Sedberry's possession is now a moot one because he had expended all of it before his account was credited with the $412.50 check. The relation of debtor and creditor automatically followed the expenditure of the money as was done.

The lumber company disposed of some of its mineral rights in the Rodessa field for $500, and on June 2, 1936, J. W. Reynolds, its president, mailed to Sedberry the draft given by the purchaser to cover the price, and in the letter of transmission said: "I am enclosing the Meeker check (draft) for the Big Pine Account you have there." This sentence seems to indicate that it was intended that the draft should be placed to the credit of a company account in the bank, but is not conclusive of such inference. Sedberry's letter acknowledging receipt of the draft is equally inconclusive of the question. He says:

"I have yours of June 2nd, enclosing check, or I should say draft on the Corona Pet. Co. of Ft. Worth, Texas. I will place this draft in my bank for collection and put the money along with the $90.00 the stockholders gave me at the last meeting."

The draft was deposited to Sedberry's account on June 4th. The account shows that on June 11th, the day the garnishment was served, there was a balance of $1,077.74. This amount is made up of the proceeds of the two Hunter Company checks and the draft for the aforesaid $500, less Sedberry's eighteen checks against the account, aggregating $209.76.

At one time Sedberry testified that he was authorized to expend the $500 sent him by Reynolds for the employment of attorneys to look up titles of lands or leases they owned in Caddo parish and that this amount was to be "placed along with the $90.00 already given me"; and at another time, replying to a question propounded to him, he said, "they sent me no instructions as to what I should do with the $500.00." Again he testified: "I had no occasion to check against the five hundred dollars. I was not authorized to use that particular five hundred dollars."

The intervention of the lumber company was initiated by Sedberry. He admits the company, as such, had no knowledge of its filing, even to the time of trial. He is a director therein and manager of the Sheveport area. It will be noted that his testimony in the main does not comport with the above-quoted allegations of the intervention. Towery is also a director of the company and testified on its behalf. His testimony throws very little light on the issues. No officer of the company save Sedberry sought to enlighten the court as regards the reason or purpose for which the $500 draft was sent to Sedberry. He contradicts himself on that issue and also contradicts the allegations of the intervention.

It is the contention of plaintiff that regardless of the original ownership of the draft and checks, the proceeds of which were credited to Sedberry's checking account, when such proceeds were passed to his credit, they lost their identity by commingling with the general funds and deposits of the bank; that Sedberry, in the capacity of depositor, is simply a creditor of the bank and that the credit due him may be and has been in this case legally seized by a creditor; and, further, that Hughes and the Lumber Company are simply his creditors to the extent of the amounts they herein claim. Interveners, of course, challenge the soundness of these contentions and assert that since Sedberry was acting in a fiduciary capacity to both of them and his account in the bank was created by deposits arising in the manner and through the transactions herein discussed, said proceeds to the extent of interveners' respective interests, have not lost

their identity and may be recovered by them as owners.

Plaintiff persists in the exceptions of no cause and no right of action. It is argued—and correctly so—that the allegations of ownership contained in the interventions are mere conclusions of law and are insufficient to form the basis for the admission of evidence to support the assertions of ownership. The issue intended to be raised by the exceptions would have been more clearly presented had interveners been required to disclose to the court the facts forming the basis of their claims of ownership, and the filing of the exceptions following the disclosures. But, since this course was not adopted and evidence was liberally admitted touching the issue of ownership, and being of the opinion that plaintiff should prevail, we have decided to deal with the merits of the case and affirm the ruling of the lower court on the exceptions.

Reduced to their essence, the facts of these cases are simply these: The lumber company sent Sedberry a draft for $500, of which it was the owner, for some purpose not clearly revealed from the record. He treated it as his own and had its proceeds credited to his personal account. Sedberry received the two checks from the Hunter Company, aggregating $787.50, representing the price of two assignments of mineral rights belonging to Hughes. Of this amount, Sedberry was entitled to over $300 and the balance was due to go to Hughes. Sedberry was acting as Hughes' agent, but placed the entire sum to the credit of his own checking account in the bank, with the intent of subsequently settling with Hughes. From the time the first of these deposits was made until the garnishment was served (a period of ten days), Sedberry regularly checked against the account as though he were the sole owner of all the funds responsible for its creation. On June 9th, the day before the check of $375 was deposited, but subsequent to the deposit of the check for $412.50 and the $500 draft, the Sedberry account showed a balance of $756.04. Hughes was then due to be paid the $250 advanced to purchase leases, and if he had been paid this amount at that time, there would not have remained enough credit on the account to cover the balance (75 per cent.) due him and the $500 due the lumber company. It is evident from these facts that Sedberry purposed to check against the account promiscuously, without scrupulous regard for the interests of those he represented, and that he intended from time to time to augment it from his own funds. It is also evident that from June 2d to June 9th, the aggregate of Sedberry's checks more than absorbed the personal interest he had in the funds making up the account, and had he then been called on to pay off, he could not have done so from the account. This means that he had withdrawn from the account more money than was due him personally, according to his and his principals' contention, and that the relation of debtor and creditor existed between them, at least to the amount of excess withdrawals. This also shows unmistakably a commingling of the funds of the three to constitute the account and a commingling of the funds making up the account with the general funds and deposits of the bank. In these circumstances and from these facts, there arises the inescapable conclusion that the primary ownership and identity of the proceeds of the draft and checks were destroyed and a new ownership and identity, for all legal intents and purposes, arose.

Plaintiff confidently relies upon Stetson, Avery & Company v. Gurney (Robertson, Intervener), reporting in 17 La. 162. The facts of that case are quite similar to those with which we are now dealing. Justice Bullard therein said:

"But money, the mere representative of value cannot be identified. When Robertson confided a sum of money to Gurney to be employed in the purchase of cotton, the latter became indebted to him in that amount. The relation of debtor and creditor arose between them, not that of depositor and depositary. If Gurney had died or had become a declared insolvent, Robertson would not have been recognized as a privileged creditor. The money was not destined to be kept and restored but to be employed."

This opinion and that in Longbottom's Executors v. Babcock, 9 La. 44, are reviewed and explained in Succession of Boisblanc, 32 La.Ann. 109, and, we think, the scope of the former materially modified, because the court in this last case held:

"Where the principals, merchants of Louisville, Kentucky, intrusted to their agent, a broker of New Orleans, a bill of exchange specially indorsed by them to the broker, to be used by him in purchasing sugar and molasses for them, and the agent

caused the bill to be discounted and the proceeds to be placed to his credit in bank, the money did not thereby become the property of the agent; and his succession acquired no better title to it than the deceased agent himself had."

It is made quite clear in this case that the claimants of funds in the two earlier cases failed to recover because of the insufficiency of the evidence adduced by them to establish the identity of such fund with that advanced by them, respectively to their agents. In the Boisblanc Case, the court further said:

"In Clay v. His Creditors, 9 Mart.(O.S.) 519, decided in 1821, the pledgor was permitted to recover, by preference, the proceeds of his property, in the hands of the syndics of the insolvent pledgee; and this was shown to be in accordance with the Roman law, the French law, and the Spanish law. It is the law of common sense, and of common honesty."

Other cases are cited and discussed and, concluding, it is said:

"We know of no process by which the agent can become the owner of the money or the property of his principal, intrusted to him for a special purpose. *The unfaithful or imprudent agent may so deal with the property of the principal as to subject it to the rights of his creditors or other innocent third persons; he may make the tracing and identification of it, and the proof of ownership difficult, even impossible.*"

We think the italicized language announces a rule that finds fitting application to the facts of the present case. Absolute identification of the principal's property or its proceeds is the indispensable fact to be established. When this has been done, he is entitled to recover. The entire field of jurisprudence bearing upon this oft-litigated question is reviewed in Tropical Printing Company v. Union Title Guarantee Company, 180 La. 702, 157 So. 534. The Boisblanc Case and its explanation of the Stetson, Avery & Company and Longbottom Cases are referred to and approved. The court in summation therein said:

"If the principal can identify his property *or its proceeds* in the hands of his agent, the principal is entitled to it."

The more recent case of Daugherty v. Canal Bank & Trust Company, 180 La. 1003, 158 So. 366, also discusses at length the limitations within which a principal may recover property confided to an agent, or its proceeds. The opinion in that case reaffirms what is said in the other cases we have referred to.

Interveners cite and rely upon D. T. Lee and A. T. Lee v. First National Bank of Minden, 18 La.App. 586, 139 So. 63, and George Sliman & Company v. Hemperly (La.App.) 168 So. 718. What we are holding in the present case, under its own peculiar facts, does not to any extent do violence to what was held in these two cases. In the Sliman Case, the undisputed facts were that the younger Sliman sent a check to his father to be expended in the repairing of property owned by the son. The proceeds of the check were deposited in the bank to the personal account of the father to be expended as directed and were there seized by his creditor. The father had made no other deposit in his bank, and therefore identity of the amount to his credit as being that which the son had sent him was beyond dispute. The court properly held that the funds belonged to the son and so decreed.

The writer of the present opinion was the organ of the court in the Lee Case. We adhere to the views therein expressed. The facts of that case are entirely dissimilar to those we now have before us. This is manifest by even a cursory reading of the opinion. In that case, we held that the account carried with the defendant bank in the name of D. T. Lee was in fact a partnership account and that the deposits made therein from time to time were from partnership funds, all to the knowledge of the bank; and that the bank improperly credited a note whereon D. T. Lee was endorser with the amount of the account after default of the maker; and that the fact that the account was carried in the name of one partner did not estop the partnership from proving the true character of the account, as between it and the bank, charged with knowledge.

For the reasons herein assigned, the judgment appealed from, in so far as it recognizes and decrees the interveners to be the owners of or entitled to any part of the seized account to the prejudice of plaintiff, is annulled, reversed, and set aside; and it is now ordered, adjudged, and decreed that the interveners' demands be rejected at their costs.

It is further ordered and decreed that the garnishee bank pay over to plaintiff from the deposit therein to the credit of

J. E. Sedberry the full amount of its judgment, with interest and attorney's fees, not to exceed, however, $1,000.