160 So. 609

## In re LIQUIDATION OF CANAL BANK & TRUST CO.

### Intervention of CLARK & CO.

No. 32606.

Feb. 4, 1935.

Rehearing Denied April 1, 1935.

Dufour, St. Paul, Levy & Miceli and Rene J. Waguespack, all of New Orleans, for liquidators of Canal Bank & Trust Co.

Henry & Cooper and McLoughlin & West, all of New Orleans, amici curiæ.

HIGGINS, Justice.

On June 30, 1933, John F. Clark & Co. filed a petition of intervention in the liquidation proceedings of the Canal Bank & Trust Company, which had been taken charge of by the state banking commissioner under the provisions of Act No. 300 of 1910, claiming that it was entitled to be paid the sum of $3,499.98, representing the proceeds of three drafts drawn on out of town banks, by preference and priority over all other creditors of the bank, and a lien and privilege on all of the assets of the bank, by virtue of the provisions of Act No. 63 of the Legislature of 1926.

The defense was that the drafts were deposited on an unrestricted indorsement, and the amount thereof immediately credited to the intervener's checking account, thereby creating the relation of debtor and creditor between the parties, the bank becoming the owner of the drafts and not the agent of the intervener for the purpose of collecting and remitting the proceeds of the draft, and that therefore the provisions of the act in question have no application.

There was judgment in favor of the intervener as prayed for, and the liquidator of the bank has appealed.

John F. Clark & Co. had a checking account with the Canal Bank & Trust Company. On March 1, 1933, it deposited with the bank three drafts drawn to its order, one drawn by

John E. Jackson and Baldwin J. Allen, both of New Orleans, for intervener John F. Clark & Co.

the National Bank of Commerce of Houston, Tex., on the New York Trust Company of New York, the second drawn by the First National Bank of Amarillo, Tex., on the Central Hanover Bank & Trust Company of New York, and the third drawn by the First National Bank of Dothan, Ala., on the Central Hanover Bank & Trust Company of New York, aggregating $3,499.98, which amount was at once credited to the checking account of the depositor.

The deposit slip used in the transaction reads on its face as follows:

"New Orleans, La., Mar., 1, 1933.
"No. 541.
"Agreement.

"Checks, drafts and other items will be handled by this Bank solely on the terms and conditions printed on the reverse hereof. In making deposits, the depositor acknowledges to have taken cognizance of all of such terms and conditions and consents and agrees to be bound thereby.

"Exchange Deposited by John F. Clark & Co. with Canal Bank & Trust Company."

Then follows a list of the amounts of the respective drafts.

On the reverse side of the deposit slip appears the following:

"3. Checks, drafts and other items drawn on other cities will be handled subject to the following terms and conditions:

"(a) This bank will act only as the agent of the customer from which it receives such items and will assume no responsibility or liability except for its own negligence, nor will it assume any responsibility or liability for any items lost in the mails.

"(b) This bank may present such items for payment or send such items for collection direct to the bank on which they are drawn or at which they are payable, or in its discretion may forward them to a collecting agent with authority to present them for payment or send them for collection direct to the bank on which they are drawn or at which they are payable.

"(c) Each collecting agent is the agent of the customer and no collecting agent shall be liable for any loss growing out of neglect, default or failure of another collecting agent.

"(d) This bank and/or collecting agents may in their discretion and at their option accept either cash or bank drafts in payment of or in remittance for such items and they shall not be held liable for any loss resulting from the acceptance of bank drafts in lieu of cash or for the failure of the drawee bank or any collecting agent to remit for such items or for the non-payment of any bank draft accepted in payment or as a remittance from the drawee bank or any collecting agent.

"(e) The amount of any check, draft or other item, for which payment is actually and finally collected funds is not received, may be charged back to the customer, regardless of whether or not the check, draft or other item can be returned.

"4. All notes or drafts deposited for collection will be protested for non-payment unless otherwise instructed."

On the same day the drafts were forwarded by the bank to its correspondent, the Chase

National Bank of New York, for collection, and on March 3, 1933, were collected and the proceeds thereof credited to the regular account of the Canal Bank & Trust Company with the Chase National Bank of New York. This was the customary banking method of handling such items; the remittances not being by draft or cash. These funds were not segregated, but remained commingled with the bank's general funds.

In the meantime, on March 1, 1933, John F. Clark & Co. withdrew from its checking account $36,956.40, leaving a balance to its credit, not including the deposit in question, of $41,981.

On March 2, 1933, the Canal Bank & Trust Company and all other banks in the state of Louisiana were closed by the proper officials under the provisions of Act No. 179 of 1902. All the banks in the city of New Orleans were closed by a resolution of the New Orleans Clearing House Association, of which the banks were members, with the approval of the Governor of the state of Louisiana, and their demand obligations were suspended. On March 3d, by virtue of a resolution of the New Orleans Clearing House Association, approved by the Lieutenant Governor of the State, the banks were permitted to reopen, subject to the following conditions and limitations:

"1. At and after that time all depositors whether checking, savings or on certificates of deposit, will be permitted to withdraw not to exceed five per cent (5%) of the amount of their respective deposits, not including therein items on which returns have not as yet been received.

"2. In case it is not withdrawn, this five per cent will in the case of each depositor be set up in a new non-interest bearing account which with any additional funds deposited therein will be subject to check without any restrictions. Checks drawn on or prior to March 1, 1933, will not be honored against such new account, except on specific instructions of the drawer.

"3. The other usual functions and duties of the banks will be performed in the customary manner, as nearly as possible.

"4. The safe deposit vaults will be open for the use of the box holders as usual.

"5. As soon as the nation-wide conditions which have made these restrictions necessary have abated, a further announcement will be made by this Association."

On March 4, 1933, by resolution of the New Orleans Clearing House Association, its members remained closed during that day. From March 6, through March 18, 1933, the banks remained entirely closed, by virtue of a proclamation of the President of the United States and the United States Treasury regulations. On March 20, 1933, pursuant to Treasury regulations, the Canal Bank was permitted to reopen, but restricted to the payment of demand obligations in an amount not to exceed 5 per cent. to each depositor. It operated in this manner until May 20, 1933, when it was placed in liquidation by the state banking commissioner, under Act No. 300 of 1910, having failed to obtain permission from the United States Treasury Department to open on an unrestricted basis.

The solution of the issues presented depends upon whether or not the transaction be-

tween the intervener and the bank resulted in a debtor and creditor relationship, or that of principal and agent. If the former, the decision of the lower court is erroneous, and, if the latter, the judgment is correct.

The authorities are far from uniform on the subject. The question has been so controversial that there has been a division of authority, and in numerous instances the decisions have been by divided courts.

In section 152, vol. 3, R. C. L., verbo "Banks," pp. 524 and 525, we find the following pertinent language:

"When a check or other commercial paper is deposited in a bank, indorsed for collection, or where there is a definite understanding that such is the purpose of the parties at the time of deposit, there is no question that the title to the paper remains in the depositor. So, checks deposited as checks do not give rise to the relation of debtor and creditor, and the title to them remains in the depositor, the bank merely acting as an agent of the depositor for the purpose of collection. If, on the other hand, there is a definite understanding at the time of the deposit that such paper is deposited as cash, it is clear that the title passes to the bank. But, where a check indorsed in blank is deposited without any definite understanding as to the way it is to be treated, but is credited by the bank to the depositor as cash, and is so entered upon the depositor's pass book, the question frequently arises whether the title to the check passes immediately to the bank, or remains in the depositor. Prima facie, according to the weight of authority, the passing to the credit of the depositor, of a check bearing an indorsement not indicating that it was de-posited for collection merely, passes the title to the bank. Still, according to the weight of authority the rule above stated is not an absolute rule, and is prima facie merely, and yields to the intention of the parties, expressed or implied from the circumstances. * * * The intention of the parties as the controlling factor may be shown in different ways, and it would seem that the right accorded to the depositor to draw upon the funds is especially material as showing an intention that title should pass to the bank. Some cases emphasize the form of the indorsement as a feature indicating what the intention of the parties is. And it seems that an indorsement of a check in blank "for deposit" is material as showing an intention that the title should pass to the bank. The general course of dealing between the bank and the depositor is frequently mentioned as an indication of the intention of the parties. * * *"

And from section 261 of the same volume, at pp. 632 and 633, we quote the following:

"As heretofore shown, there is no principle of the law of banking more firmly established than that relating to the title of money deposited generally in a bank. Such a deposit passes title to the banker immediately, and the relation of debtor and creditor arises at once between the banker and his customer. In the case of a special deposit, however, no title passes from the depositor to the bank; the transaction is not, as in the case of a general deposit, a loan, but is a bailment, and the banker and customer bear to each other not the relation of debtor and creditor, but that of bailor and bailee. Also, as we have heretofore seen, when checks or drafts are de-

posited by a customer, and are regarded by both parties as amounting to so much cash, the title to such paper passes immediately, and the relation of debtor and creditor arises. The transaction is equivalent to a purchase of. the check or draft by the banker, and he becomes responsible to the depositor for the amount thereof. To produce this result, however, it must appear that the check or draft was received as a deposit to be treated as cash, and that such was the intention of both parties. If it was deposited for collection merely, it is quite plain the bank does not take title, but merely acts as agent for collection. The property in the check or draft remains in the depositor, and the relation arising from the transaction is not that of debtor and creditor, but of principal and agent. These principles must always be borne in mind in considering the question as to the title to the proceeds of collections by banks, as it necessarily follows that, if the title to the paper to be collected passed to the bank, the proceeds of the collection will belong to it, and the bank will be merely a general debtor of the customer; whereas, if the paper was deposited for collection merely, as title thereto remains in the customer, title to the proceeds will not necessarily pass to the bank."

See, also, 7 C. J., verbo "Banks and Banking," pars. 246, 247, 248, and 249; note 11 A. L. R. 1045; and Michie on Banks and Banking, vol. 6, c. 10, § 38, p. 49.

In the case of S. E. Hall, Inc., v. Farmers' Trust & Savings Bank of Lockport et al., 177 La. 659, 148 So. 909, we said:

"As to whether the drafts were sold to the Farmers' Trust & Savings Bank, or were placed there for collection, the proceeds to be deposited to plaintiff's account when collected, or were deposited for collection and remittance, depends wholly upon the intention of the parties, to be determined from the facts surrounding the transactions."

In Holmes & Barnes v. Shawnee Milling Co. (Bank of Topeka, Intervener), 5 La. App. 391, (Syllabus), it was held:

"A bank which credits the amount of the draft to the depositor and permits him immediately to draw against it becomes the owner of the draft and bill of lading attached by implication, although the bank reserves the right to charge back the amount in case the draft is not paid.

"The deposit slip used by a bank on which there is a printed statement that the bank receiving the check or draft 'acts only as agent, etc.,' yields to and is governed by the proved intention of the parties that the bank, in effect, purchased the draft with bill of lading attached by allowing the depositor to draw the face value of the draft."

In the case of the City of Douglas v. Federal Reserve Bank of Dallas, 271 U. S. 489, 46 S. Ct. 554, 555, 70 L. Ed. 1051, the court, through Justice Stone, stated the facts as follows:

"The county of Cochise, Arizona, on December 22, 1920, drew its check on the Central Bank of Willcox, Ariz., in favor of plaintiff in error, hereafter called plaintiff. Plaintiff delivered the check indorsed in blank to the First National Bank of Douglas, Ariz., and that bank credited plaintiff's account and passbook with the amount of the check. The passbook had printed upon its face, 'All out

of town items credited subject to final payment.' The Douglas Bank indorsed the check, 'Pay to the order of the El Paso Branch, Federal Reserve Bank of Dallas,' which will be referred to as defendant, and forwarded it to that bank for collection.

"Defendant forwarded the check, in due time, to the drawee bank at Willcox. The latter debited the drawer's account with the amount of the check, stamped it 'Paid,' later returning it to the drawer, and transmitted to the defendant, in lieu of cash, its own check upon the Central Bank of Phœnix, in an amount covering this and other items. The last check was dishonored; both the Willcox Bank and the Central Bank of Phœnix having failed, the First National Bank of Douglas received no proceeds of the check, and charged back the amount of it to the account of plaintiff.

"Plaintiff brought suit in the District Court for Western Texas to recover the amount of the check, on the ground that defendant was negligent in accepting the check of the Willcox Bank in payment, instead of cash especially because it was chargeable with notice that both the Willcox Bank and the Phœnix Bank were then insolvent. The case was tried without a jury, and resulted in a judgment for defendant ([D. C.] 300 F. 573), which was affirmed by the Court of Appeals for the Fifth Circuit (2 F.(2d) 818 [44 A. L. R. 1425]). The case comes here on writ of error. * * * Plaintiff assigns as error the holding of the Circuit Court of Appeals that defendant was not in such a relationship with plaintiff as to permit plaintiff to recover for the defendant's negligence. * * *"

The court disposed of the issue in the following language:

"It is not necessary to decide any of these questions here, for when paper is indorsed without restriction by a depositor, and is at once passed to his credit by the bank to which he delivers it, he becomes the creditor of the bank; the bank becomes owner of the paper, and in making the collection is not the agent for the depositor. Burton v. United States, 196 U. S. 283, 25 S. Ct. 243, 49 L. Ed. 482; Union Electric Steel Co. v. Imperial Bank (C. C. A.) 286 F. 857; General Amer. Tank Car Corp. v. Goree (C. C. A.) 296 F. 32, 36; In re Ruskay (C. C. A.) 5 F.(2d) 143; Scott, Cases on Trusts, p. 64, note, par. 8, pp. 66–67. * * *

"While there is not entire uniformity of opinion, the weight of authority supports the view that upon the deposit of paper unrestrictedly indorsed, and credit of the amount to the depositor's account, the bank becomes the owner of the paper, notwithstanding a custom or agreement to charge the paper back to the depositor in the event of dishonor. Burton v. United States, supra; Brusegaard v. Ueland, 72 Minn. 283, 75 N. W. 228; Nat. Bank of Commerce v. Bossemeyer, 101 Neb. 96, 102, 162 N. W. 503, L. R. A. 1917E, 374; Walker & Brock v. [D. W.] Ranlett Co., 89 Vt. 71, 93 A. 1054; Aebi v. Bank of Evansville, 124 Wis. 73, 102 N. W. 329, 68 L. R. A. 964, 109 Am. St. Rep. 925. See Scott v. [W. H.] McIntyre Co., 93 Kan. 508, 144 P. 1002, L. R. A. 1915D, 139; Vickers v. Machinery Warehouse & Sales Co., 111 Wash. 576, 191 P. 869. But see [Barton Seed, Feed &] Implement Co. v. Bank, 128 Tenn. 320,

160 S. W. 848; Packing Co. v. Davis, 118 N. C. 548, 24 S. E. 365."

See, also, Fourth National Bank of Montgomery v. W. G. Bragg, 127 Va. 47, 102 S. E. 649, 11 A. L. R. 1034.

The rule is stated in 11 A. L. R. p. 1060, as follows:

"According to the majority of cases, where there is no definite understanding between the depositor and bank as to the ownership of paper, but the paper is indorsed by an unrestricted indorsement and deposited in the usual course of business with the bank, which gives credit to the depositor for the amount thereof, with the right to draw thereon, title passes to the bank."

In the case of Burton v. United States, 196 U. S. 283, at page 297, 25 S. Ct. 243, 245, 49 L. Ed. 482, cited supra, the court said:

"There was no oral or special agreement made between the defendant and the bank at the time when any one of the checks was deposited and credit given for the amount thereof. The defendant had an account with the bank, took each check when it arrived, went to the bank, indorsed the check, which was payable to his order, and the bank took the check, placed the amount thereof to the credit of the defendant's account, and nothing further was said in regard to the matter. In other words, it was the ordinary case of the transfer or sale of the check by the defendant, and the purchase of it by the bank, and upon its delivery to the bank, under the circumstances stated, the title to the check passed to the bank, and it became the owner thereof. It was in no sense the agent of the defendant for the purpose of col-

lecting the amount of the check from the trust company upon which it was drawn. From the time of the delivery of the check by the defendant to the bank, it became the owner of the check; it could have torn it up or thrown it in the fire or made any other use or disposition of it which it chose, and no right of defendant would have been infringed. The testimony of Mr. Brice, the cashier of the Riggs National Bank, as to the custom of the bank when a check was not paid, of charging it up against the depositor's account, did not in the least vary the legal effect of the transaction; it was simply a method pursued by the bank of exacting payment from the indorser of the check, and nothing more. There was nothing whatever in the evidence showing any agreement or understanding as to the effect of the transaction between the parties,—the defendant and the bank,—making it other than such as the law would imply from the facts already stated. The forwarding of the check 'for collection,' as stated by Mr. Brice, was not a collection for defendant by the bank as his agent. It was sent forward to be paid, and the Riggs Bank was its owner when sent. * * *

"When a check is taken to a bank, and the bank receives it and places the amount to the credit of a customer, the relation of creditor and debtor between them subsists, and it is not that of principal and agent. This principle is held in Thompson v. Riggs, 5 Wall. 663, 18 L. Ed. 704, and also in Marine Bank v. Fulton [County] Bank, 2 Wall. 252, 17 L. Ed. 785. See also Scammon v. Kimball, 92 U. S. 362, 369, 23 L. Ed. 483, 485; Davis v. Elmira Sav. Bank, 161 U. S. 275, 288, 40 L. Ed. 700, 702, 16 S. Ct. 502."

In 196 U. S. 283, on page 301 of the opinion, 25 S. Ct. 247, the court quoted from the case of National Bank of the Republic v. Millard, 10 Wall. 152, 19 L. Ed. 897, as follows:

"It is an important part of the business of banking to receive deposits; but when they are received, unless there are stipulations to the contrary, they belong to the bank, become part of its general funds, and can be loaned by it as other moneys. The banker is accountable for the deposits which he receives as a debtor, and he agrees to discharge these debts by honoring the checks which the depositor shall, from time to time, draw on him. The contract between the parties is purely a legal one, and has nothing of the nature of a trust in it. This subject was fully discussed by Lords Cottenham, Brougham, Lyndhurst, and Campbell in the House of Lords in the case of Foley v. Hill, 2 H. L. Cas. 28, and they all concurred in the opinion that the relation between a banker and customer, who pays money into the bank, or to whose credit money is placed there, is the ordinary relation of debtor and creditor, and does not partake of a fiduciary character, and the great weight of American authorities is to the same effect."

In 196 U. S. 283, on page 302 of the opinion, 25 S. Ct. 248, the court also quoted with approval from the case of Cragie v. Hadley, 99 N. Y. 131, 1 N. E. 537, 52 Am. Rep. 9, as follows:

"The general doctrine that upon a deposit made by a customer, in a bank, in the ordinary course of business, of money, or of drafts or checks received and credited as money, the title to the money, or to the drafts or checks, is immediately vested in, and becomes the property of, the bank, is not open to question. Commercial Bank v. Hughes, 17 Wend. 94; Metropolitan Nat. Bank v. Loyd, 90 N. Y. 530. The transaction, in legal effect, is a transfer of the money, or drafts, or checks, as the case may be, by the customer to the bank, upon an implied contract on the part of the latter to repay the amount of the deposit upon the checks of the depositor. The bank acquires title to the money, drafts, or checks on an implied agreement to pay an equivalent consideration when called upon by the depositor in the usual course of business."

In 196 U. S. 283, on page 303, 25 S. Ct. 248, the Supreme Court also stated:

"In Metropolitan Nat. Bank v. Loyd, 90 N. Y. 530, one of the cases referred to by Judge Andrews, Judge Danforth, in speaking of the effect of placing a check to the credit of a depositor in his account with the bank, said that:

" 'The title passed to the bank, and they (the checks) were not again subject to his control. * * * Scott v. Ocean Bank, 23 N. Y. 289 (and other cases cited in the opinion).

" 'It is true no express agreement was made, transferring the check for so much money, but it was delivered to the bank, and accepted by it, and the bank gave Murray credit for the amount, and he accepted it. That was enough. The property in the check passed from Murray, and vested in the bank. He was entitled to draw the money so credited to him, for, as to it, the relation of debtor and creditor was formed, and the right of Murray to command payment at once was of the very nature and essence of the transaction. On the other hand, the bank, as owner of the check, could confer a perfect title up-

on its transferee, and, therefore, when, by its directions, the plaintiff received and gave credit for it upon account, it became its owner, and entitled to the money which it represented. * * * If, as the appellant insists, the check had been deposited for a specific purpose,—for collection,—the property would have remained in the depositor; but there is no evidence upon which such fact could be established, nor is it consistent with the dealings between the parties, or with any of the admitted circumstances.

" 'These show that it was the intention of both parties to make the transfer of the check absolute, and not merely to enable the bank to receive the money upon it as Murray's agent.'

"The same principle is set forth in Taft v. Quinsigamond Nat. Bank, 172 Mass. 363, 52 N. E. 387. In that case the court said: 'So when, without more, a bank receives upon deposit a check indorsed without restriction, and gives credit for it to the depositor as cash in a drawing account, the form of the transaction is consistent with and indicates a sale, in which, as with money so deposited, the check becomes the absolute property of the banker.'

"In the case at bar the proof was not disputed. The checks were passed to the credit of defendant unconditionally, and without any special understanding. The custom of the bank to forward such checks for collection is a plain custom to forward for collection for itself. The only liability of defendant was on his indorsement."

In vol. 7 C. J., on the subject of "Banks & Banking" par. 250, p. 602, we find the following language:

"The mere crediting of paper restrictively indorsed to the depositor as cash does not of itself transfer the title to the bank. But it is held by numerous authorities that the title does pass, if the depositor has a right to draw at once for the amount credited, as though it were a cash deposit, although there is also considerable authority for the view that, under such circumstances, title does not pass to the bank until the depositor has actually drawn against the amount so credited."

Counsel for the intervener contends the fact that the deposit slip designated the bank as the agent to collect the drafts and reserved the bank the right to debit the depositor's account if the drafts were not honored shows that it was the intention of the parties that title to the drafts would not pass and that the credit was only conditional, to be made absolute when the proceeds of the drafts were collected by the bank.

A similar argument was made in the case of Burton v. United States, supra, which the court answered by saying:

"The testimony of Mr. Brice, the cashier of the Riggs National Bank, as to the custom of the bank when a check was not paid, of charging it up against the depositor's account, did not in the least vary the legal effect of the transaction; it was simply a method pursued by the bank of exacting payment from the indorser of the check, and nothing more."

In the case of Holmes & Barnes v. Shawnee Milling Co., 5 La. App. 391, supra, the court in rejecting a similar contention, said:

"As for the printed statement on the deposit slip, that the bank receiving the check

'acts only as agent, etc.,' that yields to and is governed by the proved intent of the parties to the contrary at the time the slip was made, showing that the parties to the slip, did in effect and in fact, intend and perfect at the time, a sale and delivery of the draft and bill of lading attached. The evidence shows that the draft was drawn and taken with bill of lading attached, to Bank of Topeka, for the purpose of having it cashed and the proceeds credited to Shawnee Milling Co., to the end, that the credit might be drawn out that day. * * *"

And 5 La. App. 391, on page 394:

"The printed statement at the bottom of the deposit slip, that the check would be charged back if it was not paid and that the bank assumed no responsibility beyond due diligence, was not inconsistent with a purchase and delivery as between Bank of Topeka and Shawnee Milling Co., drawer and payee, because if the draft had not been paid, the Bank of Topeka would have had the right to charge it back, as a matter of law, provided there was no express agreement to the contrary."

In the case of Gilbert B. Owen v. Tangipahoa Bank & Trust Co. et al., 180 La. 747, 157 So. 549, 550, decided October 29, 1934, where a depositor was claiming a privilege under Act No. 63 of 1926, and the deposit slip contained the same statements as the one in the instant case, we held that:

" * * *. It is well settled that a deposit slip is a mere acknowledgment by the bank that the amount named has been received, and does not purport to embody the contract between the parties. [Citing a number of authorities.] * * *

"As a deposit slip constitutes a receipt, and nothing more, it is, like all other receipts, only prima facie and not conclusive evidence, and may be explained or contradicted by evidence aliunde." To the same effect, see, also, Moss on Banks & Banking (6th Ed.) vol. 1, § 290, par. 676.

We remanded the case to the lower court in order to receive the evidence which had been excluded erroneously and which had been offered by the liquidator of the bank for the purpose of showing that the depositor was a debtor of the bank and, therefore, not entitled to a preference under Act No. 63 of 1926.

The Uniform Negotiable Instrument Statute of this state, Act No. 64 of 1904, article 3, § 36, provides:

"Sec. 36. An endorsement is restrictive, which either:

"1. Prohibits the further negotiation of the instrument; or

"2. Constitutes the indorsee the agent of the indorser; or

"3. Vests the title in the indorsee in trust for or to the use of some other person. But the mere absence of words implying power to negotiate does not make an indorsement restrictive."

In the instant case the intervener does not claim that the negotiable drafts were deposited with any restrictive indorsements or that its right to immediately check against the amount of the drafts, which was at once credited to its checking account, was in any way conditional or restricted. The evidence unquestionably shows that it was the intention of the intervener to deposit the drafts

and not place them with the transit department of the bank that handled only items for collection. Intervener knew that the teller immediately credited the drafts to its checking account, both on the bank's books and on the depositor's passbook, so that they might be drawn against at its pleasure, and did not protest or request that the status of the transaction be changed to a regular collection item through the transit department, and, consequently, acquiesced in the way or manner that the bank handled the drafts. Intervener does not deny that, if it so desired it could have checked out the credited proceeds of the draft on the same day of the deposit, or on March 1st. The record shows that the intervener did draw out of its account the sum of $36,965.40, on March 1st. While it did not deplete the full amount of its credit, there being a large balance, is there any doubt that if it had elected to do so, it was within its power and right to accomplish this result? The withdrawal or the checking out of the funds credited to its account was left entirely to the volition of the intervener. The placing at the disposal of the intervener of the amount or face value of the drafts by immediately crediting its checking account therewith was equivalent to placing to its credit and at the command of the intervener that much cash.

▮ The intentions of the parties, of course, must be determined as of March 1st, the date the deposit was made, and not in the light of the events that subsequently took place. The intervener dealt with the bank, as any other person did, who deposited cash with the bank on March 1st, under the firm conviction and belief that its funds or the credit therefor would be safe and secure, otherwise, no one would have intrusted anything of value to the bank. Therefore, the fact that the bank was subsequently placed on a restricted basis and eventually in liquidation cannot help us to determine what was the intention of the parties on March 1st.

It is conceded that the bank had the right to charge back against intervener's account the amount of any draft that had been credited, but which was dishonored. The bank had the choice of doing this or calling upon intervener to make good the dishonored draft in some other way. The law gave the bank this right, aside from any statement contained on the deposit slip. Intervener brought to the bank a negotiable instrument. It unrestrictedly indorsed the paper, and through this indorsement put the instrument in commerce. At the time it accepted credit for the drafts, its liability was fixed by the Negotiable Instrument Statute. Intervener was the first indorser or guarantor of the drafts. It was the warrantor of the instruments. It was liable to pay the party to whom it negotiated the paper or transferred title. The liability of the first indorser to his transferee was imposed by the law merchant long before the Negotiable Instrument Statute was written. This rule was crystallized into the statute law by the Uniform Negotiable Instrument Act. But even without the law merchant and the Negotiable Instrument Statute, under the articles of the Revised Civil Code of Louisiana there is warranty. Corcoran v. Riddell, 7 La. Ann. 268; Washington Jenkins v. Parish of Caddo, 7 La. Ann. 559, 561; Civ. Code, arts. 2474, 2475, 2476, 2501, 2504, and 2505.

It seems clear under the Negotiable Instrument Statute that one who negotiates a negotiable paper through an unrestricted indorsement and receives cash to the amount of its face value or the equivalent thereto, in the form of immediate credit to his unrestricted checking account, cannot successfully maintain that he is both the owner of the funds as well as the draft or check. In short, title to both the funds and the negotiable paper cannot simultaneously remain in the depositor under such circumstances.

The resolution of the New Orleans Clearing House Association adopted on March 3, which permitted the depositors to draw against their deposits not exceeding 5 per cent. of the amount thereof "not including therein items on which returns have not as yet been received," does not help intervener's case. The quoted language refers to items for collection, the proceeds of which had not been received by the bank, and does not refer to deposits, drafts, or checks purchased by the bank or of which the bank became the bona fide holder and owner for value in due course. Furthermore, the resolution of the Clearing House Association could not confer a privilege where the law did not grant it, and, as we have already stated, the status of intervener's rights were established the day the deposit was made or on March 1st.

█ In this state it is well settled that privileges are granted only in pursuance of law and not from considerations of equity, and that the one who asserts a privilege has the burden of establishing it. Boylan's Detective Agency & Protection Police v. Arthur A. Brown & Co., 157 La. 325, 102 So. 417; see, also, Ittman et al. v. Kracke & Flanders Co.,

12 La. App. 672, 127 So. 106; Dodd v. Horan (La. App.) 121 So. 323; article 3185, Civ. Code; Red River Const. Co. v. Pierce Petroleum Corp., 165 La. 565, 115 So. 752.

█ The drafts having been deposited without a restrictive indorsement by the depositor and at once, with its consent, credited to its checking account by the bank, in order to give the depositor the right to check against the funds immediately, the depositor became a creditor of the bank and the bank the owner of the paper, notwithstanding the fact that the bank had the right under the law to debit the depositor's account in the event the drafts were not honored, and, notwithstanding the printed statement on the deposit slip that the bank was receiving the drafts as agent for collection, because that statement yields to and is governed by the implied intention of the parties, in the absence of an express agreement between them to the contrary.

Under the Uniform Negotiable Instrument Statute of this state, Act No. 64 of 1904, particularly sections 25 and 26, and clauses 3 and 4 of section 52, the bank became the holder and owner in due course of the drafts, having given the intervener value therefor. See authorities cited, supra.

We are referred to the following cases: Louisiana Ice Co. v. State National Bank, 1 McGloin, 181; In re Canal Bank & Trust Co., in Liquidation (Intervention of E. C. Palmer, Ltd.), 154 So. 498 (pending in the Court of Appeal on application for rehearing); and S. E. Hall v. Farmers' Trust & Savings Bank of Lockport et al., 177 La. 659, 148 So. 909.

The first case was considered in 1873, before there was any uniform negotiable in-

strument law in effect in this state. The reasoning of the court otherwise is in conflict with the weight of authority referred to by the Supreme Court of the United States in the decisions cited, supra.

In the second case, the Court of Appeal found that there was a contract of agency, mainly relying upon the printed statements on the deposit slip to the effect that the bank was acting as agent for collection and had the right to debit the depositor's account in the event the draft was not honored; citing the case of the Louisiana Ice Company v. State National Bank, supra, and other decisions representing the minority view. The case was apparently not presented from the standpoint of the Negotiable Instrument Law, as that point is not discussed in the opinion.

The third case is not apposite, because the court concluded that the evidence showed that the depositor did not have the right to draw against the amount of the drafts until after they were actually paid, and the proceeds received by the bank, and, that as a matter of fact, he had not drawn against them.

It is true that in 177 La. 659, on page 662 of the opinion, 148 So. 909, this court said:

"Here, the deposit slips, which were accepted by the bank, state that all checks and drafts, except those drawn on the bank, will be credited, subject to final payment. This statement indicates that it was not the intention of the parties that title to the drafts should pass to the bank, for the credit to be given was conditional in character, and this fact is inconsistent with ownership. Carson v. Federal Reserve Bank, 226 App. Div. 225,

235 N. Y. S. 197, 14 A. B. R. (N. S.) 58; Id., 133 Misc. 277, 231 N. Y. S. 620; Annotations in 11 A. L. R. 1071, and 42 A. L. R. 502."

On a re-examination of the authorities, we find that the cases cited in support of the above quotation represent the minority view, as we have already hereinabove pointed out.

Having concluded that the bank became the owner of the drafts and, therefore, collected them, not as the agent of the intervener, but for its own account, it is obvious that the provisions of Act No. 63 of 1926 are not applicable, because the statute only covers a case where the bank is acting as agent for the collection, remittance, or delivery of a draft, check, note, etc., of a customer.

Intervener's funds, having become commingled with the bank's general deposits, and therefore incapable of identification, cannot be claimed in specie as where the funds of a special deposit are segregated. Daugherty v. Canal Bank & Trust Co., 180 La. 1003, 158 So. 366; Tropical Printing Co. v. Union Title Guarantee Co., 180 La. 702, 157 So. 534.

The state banking commissioner concedes that the intervener is an ordinary creditor for the amount claimed subject to certain credits.

It is ordered, adjudged, and decreed that the judgment of the district court be annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that there be judgment herein in favor of John F. Clark & Co., intervener, and against J. S. Brock, state banking commissioner, and Harry O. Thompson, special agent, as liquidators of the Canal Bank & Trust Company, in the full sum of $3,499.98, subject to the credit of such

amounts and liquidating dividends that have already been paid, recognizing the intervener as an ordinary creditor, to be paid in due course of the administration of the liquidation proceedings; intervener to pay the costs of appeal.

On Application for Rehearing.

PER CURIAM.

In the briefs which have been filed in support of the application for a rehearing, our attention is directed to the decision rendered in Joffrion-Woods, Inc., v. St. James Bank & Trust Co., 171 La. 172, 129 So. 808, 809. It is said that the court decided in that case that, when a customer placed in his local bank an out-of-town check or draft, for deposit, and received credit for the amount of the item, his ownership of the check or draft did not pass to the bank but remained in him until the local bank received payment. The only question in that case was whether the local bank was liable to the depositor for the amount of the check, or was warranted in charging back to the depositor the amount of the check, when the amount was not collected by the local bank, because of the failure of the bank on which it was drawn. It was held that the local bank was not liable for the loss, and had the right to charge back to the depositor the amount of the check, because of the provisions of Act No. 85 of 1916, p. 204, and of Act No. 86 of 1926, p. 125; and that the so-called "weight of authority" in other jurisdictions, on the question whether title to the instrument had passed to the local bank, was a matter of no importance whatever. We said that the statutes on the subject did not make a distinction between a case where the local bank received the check or draft for collection and a case where the bank received the item for deposit, and that, inasmuch as the nonliability of the bank— or right of the bank to charge the item back to the depositor if not collected—was determined by statute, the opinions of the law-writers and judges on the abstract question as to whether title to the check or draft had passed to the bank was a matter of no practical importance. Here is how we expressed the idea:

"Counsel for Joffrion-Woods, Inc., contend that a distinction should be made between a case where the forwarding bank received the instrument for collection and a case where the forwarding bank, as in this case, received the instrument for deposit and gave the depositor credit for the amount. Our answer is that neither of the statutes [Act No. 85 of 1916 or Act No. 86 of 1926] makes any such distinction. They relieve the forwarding bank from liability as well when the instrument has been received for deposit as when it has been received for collection. The statutes recognize and virtually declare that, when a bank receives from one of its depositors an item for collection or deposit, the bank may immediately give the depositor credit for the amount without becoming irrevocably the owner of the instrument or forfeiting the right to charge the amount back to the depositor if the bank fails to make the collection."

We used the expression "without becoming irrevocably the owner of the instrument" as being synonymous with the expression "without forfeiting the right to charge the amount back to the depositor if the bank fails to make

the collection." There is nothing in either of those expressions inconsistent with the decision which we have rendered in the present case.

The application for a rehearing is refused.

O'NIELL, Chief Justice (concurring).

I concurred in the decree rendered in this case for the reason merely that the checks which John F. Clark & Co. deposited in the Canal Bank were not received by the bank "as agent, * * * for collection and remittance or delivery to its principal," but were received by the bank "for deposit." The statute, Act No. 63 of 1926 (section 1), declares very plainly that the lien arises only when the bank receives the check or other instrument "as agent * * * for collection and remittance or delivery to its principal and not for deposit." There are two statutes, Act No. 85 of 1916 and Act No. 86 of 1926, which declare, substantially, that, when a bank receives from a customer an out-of-town check or draft for collection or deposit, the bank may immediately give the customer credit for the amount without becoming irrevocably the owner of the instrument, or forfeiting the right to charge the amount back to the customer if the bank fails to make the collection. Joffrion-Woods, Inc., v. St. James Bank & Trust Co., 171 La. 172, 129 So. 808. I respectfully submit, therefore, that, inasmuch as the question presented in this case is controlled by statute, the opinions of the law-writers and judges in other jurisdictions, on the abstract question as to whether or when the title to the instrument passes to the bank, is a matter of no importance.