441 So.2d 316 (1983)
Mary Ann SCHWEGMANN a/k/a Mary Ann Blackledge
v.
John G. SCHWEGMANN, Jr., John F. Schwegmann, Melba Margaret Schwegmann and Schwegmann Bros. Giant Supermarkets, Inc., Schwegmann Bros. Terminal, Inc., Schwegmann Bros., Inc., Schwegmann Bros., Westbank, Inc., Schwegmann Bros. Westside Corporation and Schwegmann Veterans Corporation.
No. 83-CA-305.
Court of Appeal of Louisiana, Fifth Circuit.
November 9, 1983.
Writ Denied January 6, 1984.
*319 Bettyanne Lambert-Bussoff, Lambert & Waldrup, New Orleans, for plaintiff-appellant.
David Stone, Jo Harriet Strickler, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for defendants-appellees.
Before KLIEBERT, GAUDIN and DUFRESNE, JJ.
KLIEBERT, Judge.
This is a devolutive appeal by Ms. Mary Ann Blackledge, plaintiff, from a judgment dismissing, on a motion for summary judgment, all of the causes of action alleged in her petition against Mr. John G. Schwegmann, Jr. (hereafter Mr. Schwegmann), et al,[1] defendants, except the cause to recover in quantum meruit for the value of uncompensated services performed separate *320 and apart from the relationship of concubinage.[2]
Ms. Blackledge asserts that the allegations of her petition raise six causes of action against the defendants: (1) Specific performance and/or damages based on breach of contract; (2) Recognition of constructive trust or damages based on implied contract; (3) Declaratory relief; (4) Quasi Contract and/or Quantum Meruit; (5) Interference with contract rights; and (6) Declaration of simulation and/or revocatory action. Additionally, though not an itemized cause, she asserts the existence of a partnership and prays for its dissolution and/or distribution of its assets.
Notwithstanding Rule 2-12-4 of the Uniform Rules for the Courts of Appeal, Ms. Blackledge's brief did not particularize errors in the trial court judgment or specify issues on appeal. Rather, she argues that there are issues of fact and as a matter of law, her petition contains valid causes of action; hence, the granting of the motion to summarily dismiss her claims was error. We disagree and affirm the judgment of the trial court.
The petition alleged a contract entered into by Ms. Blackledge and Mr. Schwegmann in May, 1966, whereby they agreed to live together and, while doing so, combine their skills, efforts, labor and earnings and to share equally any and all assets and property acquired and accumulated as a result of their joint skills, efforts, labor and earnings. The horns of the legal dilemma upon which the petition places her is apparent from her testimony given by deposition. As facts are elicited to show the confection of an agreement, the nature of the services or their value, the same facts establish that the alleged agreement, if in fact proven, is meretricious and, therefore, void.
Ms. Blackledge claims she and Mr. Schwegmann lived together, without marriage, for twelve years pursuant to an oral agreement. The agreement, according to her, was confected in 1966 when Mr. Schwegmann told her he wanted to "share everything" with her and she said "okay". At the time of this conversation, Mr. Schwegmann was a twice divorced, middle age male who owned a chain of supermarkets and other assets, and Ms. Blackledge was a 24 year old unmarried female who had no property or other financial assets. The claimed contractual agreement was never reduced to writing and there was no witness to the alleged conversation in which it was confected.
Following the confection of the alleged contractual agreement, Ms. Blackledge and Mr. Schwegmann lived together continuously from May 1966 to May 1978. In this time frame, Ms. Blackledge contends she rendered services as a companion, housekeeper and cook, as well as a mother to Mr. Schwegmann's children, and as a business advisor, political assistant and confidante to him and his controlled corporations.
Throughout the time they lived together, Ms. Blackledge and Mr. Schwegmann had sexual relations on a regular basis. Ms. Blackledge's living expenses, dental and medical bills, clothing costs, entertainment and traveling expenses were paid for by Mr. Schwegmann. He also provided her with a monthly allowance check during their cohabitation and continued the checks after they ceased living together until the time this suit was filed. The sexual relationship also continued during visits after the cohabitation had terminated.
In the absence of specific assignments of error or issues, we will discuss each of the asserted causes of action (itemized above as [1] thru [6]) under the captions indicated below.
BREACH OF CONTRACT
Since the issue arises on a motion for summary judgment, we did not need to *321 and made no determination as to whether the so-called contract alleged in the petition and testified to by Ms. Blackledge was in fact proven. Rather, for the purpose of this motion, we consider the facts alleged in the petition, as expanded on and amplified in the depositions as true.
Counsel for Ms. Blackledge prays for specific performance of the alleged oral contract or alternatively damages for breach of the contract. The defendants contend no valid contract could be confected because (1) the alleged "contractual agreement" is a universal partnership and consequently invalid because it is not in writing; (2) the object of the alleged contract was not certain, hence, it violates the requirements of La.C.C. Articles 1779(3) and 1886; consequently no contract was confected; (3) the alleged contract is not supported by adequate consideration; and (4) the alleged contract is void because it is meretricious. The trial judge ruled on only the first and last of defendants' contentions, thus negating the necessity of his considering the others.
A universal partnership is defined by La. C.C. Article 2829[3] as follows:
"Universal partnership is a contract by which the parties agree to make a common stock of all the property they respectively possess; they may extend it to all property real or personal, or restrict it to personal only; they may, as in other partnerships, agree that the property itself shall be common stock or that the fruits only shall be such; but property which may accrue to one of the parties, after entering into the partnership, by donation, succession or legacy, does not become common stock, and any stipulation to that effect, previous to the obtaining the property aforesaid, is void."
and expanded on in the two subsequent articles as follows:
Art. 2830. A universal partnership of profits include all the gains that may be made from whatever source, whether from property or industry, with the restriction contained in the last article, and subject to all legal stipulations to be made by the parties.
Art. 2831. If nothing more is agreed between the parties, than that there shall be a universal partnership, it shall extend only to the profits of the property each shall possess, and of their credit and industry.
As found by the trial judge, the contractual agreement alleged in the petition "fits exactly the codal definition of universal partnership". Ms. Blackledge testified she and Mr. Schwegmann were going to pool all of their assets and share the fruits of their labor, thus clearly asserting an intention to confect a partnership. Indeed, among others, the plaintiff's petition asks the court to consider the conduct and agreement of the parties as a partnership and prays for its dissolution and the distribution of its assets to the partners.
Under the provisions of La.C.C. Article 2834, a universal partnership cannot be created "... without a writing signed by the parties ..." Hence, Louisiana does not recognize as a valid universal partnership an oral agreement between a man and a woman who live together and agree to split certain properties standing in the name of one of them. Heatwole v. Stansbury, 212 La. 685, 33 So.2d 196 (1947); Foshee v. Simkin, 174 So.2d 915 (1st Cir.1965); Chambers v. Crawford, 150 So.2d 61 (2nd Cir. 1963); Gadlin v. Deggs, 23 So.2d 704 (4th Cir.1945).
Ms. Blackledge testified her alleged understanding or agreement was not reduced to writing. Therefore, under the jurisprudence above cited, the trial court held the oral contract alleged by the plaintiff, even if proven, would be a universal partnership *322 and, as such, invalid because not made in writing.
In her brief on appeal, counsel for Ms. Blackledge states "historically concubinage cases have couched the agreement as a universal partnership"; but then argues "there is no statutory reason why the courts began to apply partnership law to any oral contract". Consequently, "there is no explanation [why] within the body of concubinage law except that the goals of the parties were joint and the state is a community property state". We suggest the explanation is found in the fact that the community of acquets and gains created by the marriage is legally considered a partnership between the partners in the marriage.
In most concubinage cases, as is the case here, the goal of the plaintiff is to obtain for the concubine the civil benefits which would flow to the wife as a marital partner. In the absence of the marriage, some relationship, other than a sexual one, must exist between the parties for the civil benefits to flow to the person acting as the pseudo wife. Consequently, it is logical for the concubine's counsel to urge a partnership akin to the community of acquets and gains which applies to marital partners and for the court to apply partnership law in denying it.
As argued by counsel for Ms. Blackledge, it was theoretically and legally possible for the parties to establish a commercial or some partnership other than a universal partnership. However, the facts are that under the allegations of the petition and the testimony of Ms. Blackledge the relationship created was that of a universal partnership, not some other type. Additionally, this court cannot lose track of reality. Although it was theoretically and legally possible for the parties to marry and thus create a legal partnership based on a sexual relationship, the facts here are that the parties did not marry. Hence, as subsequently pointed out in this opinionhowever the relationship is categorizedunder the law the alleged agreement is a meretricious one and therefore void. For the same reason, applying the present partnership articles of the Civil Code (which do not require the partnership to be in writing) would not produce the results desired by the plaintiff.
Accordingly, we uphold the trial judge's ruling that the alleged oral agreement asserted by Ms. Blackledge would be a universal partnership and thus be invalid because not made in writing. Further, even if the alleged agreement was not required to be in writing, it would be unenforceable because it is a meretricious one. Hence, except as we hereafter expand on the concept of a meretricious agreement under the caption Quantum Meruit, it is unnecessary for us to consider the other grounds urged by the defendants as defense to the plaintiff's claim for breach of an alleged contract.
RECOGNITION OF CONSTRUCTIVE TRUST OR DAMAGES BASED ON IMPLIED CONTRACT
Ms. Blackledge contends the fact she and Mr. Schwegmann lived together as man and wife for twelve years caused a contract to be implied between them. On the basis of this implied contract she asserts the creation of a constructive trust for her benefit over the joint assets held by Mr. Schwegmann or alternatively the right to recover damages based on his breach of the "implied contract". She argues the constructive trust is imposed as an equitable remedy to protect her interest in the joint properties because she had a "reasonable expectation and belief" she and Mr. Schwegmann had an agreement and she had the greatest confidence and trust he would carry out the agreement.
The legal concept for a constructive trust is to impose an equitable lien on property because of a fiduciary relationship between the parties. The heart and soul of the equitable lien is a fiduciary relationship. Neither in the pleadings nor in the deposition of Ms. Blackledge is there established the requisite fiduciary relationship. Further, it is clear the Louisiana Civil Code prohibits the imposition of a constructive *323 trust on property. Succession of Onorato, 219 La. 1, 51 So.2d 804 (1951); In re Liquidation of Canal Bank & Trust Co., 181 La. 856, 160 So. 609, 616 (1935); see also Mansfield Hardwood Lumber Company v. Johnson, 268 F.2d 317 (5th Cir.1959); In re Hagin, 21 F.2d 434, 437 (E.D.La.1927), aff'd sub nom. Phoenix Bldg. & Homestead Ass'n v. E.A. Carrere's Sons, 33 F.2d 563 (5th Cir. 1929); Bankhead v. Maryland Casualty Company, 197 F.Supp. 879 (E.D.La.1961).
Her theory for recovery under an implied contract requires the characterization of her relationship with Mr. Schwegmann as a marriage, when in fact they were never married and neither of them ever believed they were married to each other. As a matter of fact, Ms. Blackledge testified she knew Mr. Schwegmann had a marriage contract (against formation of a community of acquets and gains) with his second wife because, as she stated, "he wanted the property protected in the event of a divorce".
In oral arguments and in appellant's briefs, counsel for plaintiff strenuously urges the novelty of the relationship and importance of her case in a changing society. The trial judge rejected the argument and gave excellent legal written reasons for doing so. Therefore, we adopt his reasons which follow as our own:
"Claims like the plaintiff's are not foreign to Louisiana courts. Louisiana law has defined a person in Miss Blackledge's position as a concubine, a woman who `occupies the position, performs the duties, and assumes the responsibilities of a wife, without the title and privileges flowing from a legal marriage.' Purvis v. Purvis, 162 So. 239, 240 (La.App. 2d Cir. 1935). Louisiana terminology for the man with whom a concubine lives is `paramour'.
A great body of jurisprudence has grown up confirming that concubines and paramours have no rights in each other's property. Jackson v. Hampton, 134 So.2d 114 (La.App. 2d Cir.1961); Rochelle v. Hezeau, 15 La.Ann. 306 (1860). See also Mintz & Mintz, Inc. v. Color, 250 So.2d 816 (La.App. 4th Cir.1971) (where no garnishment of a woman's wages could be had for the debt of her paramour) and Sims v. Matassa, 200 So. 666 (La.App. 1st Cir.1941) (where no seizure of a woman's property could be accomplished to satisfy her paramour's debt).
The Fourth Circuit Court of Appeal recently refused to recognize a concubine as a surviving spouse in community and succinctly described Louisiana law: `The law could scarce be plainer: a sharing of bed and table, for a night or for a lifetime, does not by itself constitute marriage.' Succ. of Donohue, 389 So.2d 879, 880 (La.App. 4th Cir.1980). See also Sesostris Youchican v. Texas & P.R. Co., 147 La. 1080, 86 So. 551 (1920); Foshee v. Simkin, supra."

A substantial portion of the plaintiff counsel's brief is devoted to a historical analysis of the Louisiana Law on concubinage to show that its development was predicated on public policy construed by the judiciary. She then argues that changes in the mores of society as regards cohabitation have changed so radically, we should not impose on a man and woman who cohabitate without marriage a standard based on moral considerations merely to protect Victorian values which have been abandoned by so many in our society. Therefore, she urges it is time for the courts of Louisiana to develop a legal vehicle to protect the property rights obtained during cohabitation by a male and female in a sexual relationship without benefit of marriage. In support of the contentions, she urges a constitutionally protected right against discrimination between wives and concubines. She compares the discrimination she sees to that formerly existing between legitimate and illegitimate children and says concubinage discriminates against black heritage and culture but more particularly against women.
We neither agree with her appreciation of the sociological changes nor the necessity for a change in legal philosophy as to concubinage nor do we see the violation of a constitutionally protected right against discrimination. The State has valid reason *324 to discourage relationships which serve to erode the cornerstone of society, i.e., the family. In every known civilized society, replacement of its members is performed within the context of the family. Although it is conceivably possible that sexual relations and child rearing could be deregulated or governed by norms that do not entail the encouragement, support and protection of family institutions, past experiments in that direction have failed. (See "The Attempt to Abolish the Family in Russia" in The Great Retreat by Nicholas S. Timasheff, Copyright 1946 by E.P. Dutton & Co., Inc. Further, in the case of the children, legitimate or illegitimate, they were not the cause of their status, but here the status of concubine was a voluntary and desired one, for the parties neither married, wanted to marry, nor believed they were married.
Under present Louisiana law, unmarried cohabitation does not give rise to property rights analogous to or similar to those of married couples. Concubines have no implied contract or equitable liens that afford them any rights in the property of their paramours. Moreover, in our view, although Victorian, the values sought to be protected by the formulation of those legal concepts are imperative if we are to maintain our civilized society.
QUASI CONTRACT AND QUANTUM MERUIT
The plaintiff asserts a right to recover compensation for the services rendered to Mr. Schwegmann under a quasi contract or quantum meruit theory. Under our law, when one benefits or is unjustly enriched from the labor of another, the law implies a promise to pay a reasonable amount for the labor, even in the absence of a specific contract. La.C.C. Article 1965. Bordelon Motors, Inc. v. Thompson, 176 So.2d 836 (3rd Cir.1965).
Here Ms. Blackledge testified that she rendered domestic services and business services and here claims compensation for both. Since the trial court and we reached conclusions based on the nature of the services, we consider each category of services separately.
Domestic Services
Ms. Blackledge stated in her deposition that she performed domestic services including cooking, cleaning, chauffering, taking care of Mr. Schwegmann's daughter, and acting as a nurse to him after his stroke. She also stated that she and Mr. Schwegmann had sexual relations: (1) on their first date in October or November of 1958; (2) throughout the time they dated before living together; (3) while they lived together in his house; and (4) when she visited after she left his house, and that this was one of the reasons Mr. Schwegmann paid her money. In describing her alleged agreement with Mr. Schwegmann, she testified that part of her promise was to "be a wife to him " and that "John and I made all the commitments and agreements to each other that anyone would take when they got married". She understood a condition of the agreement to be that while they lived together neither of them would have sexual relations with anyone else.
Clearly from her testimony, the domestic services of child care, nursing, cooking, etc., were inextricably interwoven with sexual services in a concubinage relationship. Louisiana law clearly disallows claims in quantum meruit by concubines for domestic services when the services are interwoven with the sexual relationship.
From early in Louisiana law, where parties to a contract cohabit in a sexual relationship and their agreement to cohabit is part of the basis for the agreement between them, the agreement is unenforceable because it is an unlawful contract for meretricious services. Delamour v. Roger, 7 La.Ann. 152 (1852). See also La.C.C. Article 1892; Sparrow v. Sparrow, 231 La. 966, 93 So.2d 232 (1957); and Foshee v. Simkin, 174 So.2d 915 (1st Cir.1965) for more recent cases.
More recently, the First Circuit Court of Appeal in Guerin v. Bonaventure, 212 So.2d 459 (1st Cir.1968) at pages 464-65 denied *325 the claims of a concubine in quantum meruit in the following language:
"In view of the parties living together as man and wife, it was only natural that plaintiff lend some assistance to the paramour who furnished full subsistence and a home for plaintiff and her child as if they were his lawful wife and offspring. In this manner plaintiff received full remuneration for services rendered to defendant Bonaventure in performing the duties of mistress of his household and some measure of assistance in his various business enterprises.
* * * * *
All of the circumstances considered, the services rendered by plaintiff are so completely intertwined with her illegal cohabitation with Bonaventure as to be utterly indistinguishable therefrom. In such circumstances, the remuneration received, in the form of support and subsistence over the years is in law deemed full remuneration therefor. Consequently she has failed to establish her right to legal remedy or redress."
Clearly, the plaintiff here has no valid cause of action to recover in quantum meruit for the domestic services she claims to have rendered for by her own testimony the domestic services were inextricably interwoven with the sexual relationship.
Business Services
Plaintiff testified she performed business services for Mr. Schwegmann and his corporations by (1) helping him write editorials for Schwegmann's newspaper advertisements; (2) rendering investment advice; (3) assisting and rendering advice as to Mr. Schwegmann's political career; and (4) keeping him informed of things she saw in the stores which could have an adverse effect on the business. Under our law, the plaintiff may be entitled to compensation for the rendition of the services if the services were in fact rendered and do meet the prerequisites of the equitable principles formulated by the jurisprudence for recovery. In the Bonaventure case, supra, the Third Circuit clearly stated the equitable principles upon which recovery can be had:
"Our jurisprudence appears settled to the effect that predicated upon equitable principles, the claims of a paramour and concubine will be recognized and enforced with respect to joint or mutual commercial ventures, provided such enterprises arose independently of the illicit relationship. Heatwole v. Stansbury, 212 La. 685, 33 So.2d 196; Sparrow v. Sparrow, 231 La. 966, 93 So.2d 232; Foshee v. Simkin, La.App., 174 So.2d 915.
The rationale of the rule pronounced in the Heatwole, Sparrow and Foshee cases, supra (and the numerous authorities therein cited) is that where the concubinage is merely incidental to the business arrangement, the equitable rights of both parties will be recognized and enforced provided they be established by strict and conclusive proof. Stated otherwise, the rule is that if the commercial enterprise is independent of the illegal cohabitation, each party may assert his rights in the common endeavor."
Since the issue arose on a motion for summary judgment the trial judge concluded and we agree the plaintiff must be given every benefit of the doubt. Conceivably given the opportunity to do so, she could establish real and substantial business services performed for the defendants, including Mr. Schwegmann, that have not been previously compensated and which were separate and distinct from the concubinage relationship. Accordingly, we agree with the trial judge's ruling excepting her claim of compensation for business services from the summary dismissal of her claims.
OTHER ASSERTED CAUSES OF ACTION
In addition to those discussed above, the plaintiff in her petition asserted that (1) she was entitled to declaratory relief because an actual controversy has arisen between her and the defendants relative to her legal rights; (2) the defendants other than Mr. Schwegmann have interfered with the contractual rights she obtained through *326 her agreement with Mr. Schwegmann, and (3) she is a creditor of the defendant Mr. Schwegmann and his purported sale of the stock of his controlled corporations to his son was a simulation or in fraud of her rights as a creditor and consequently should be revoked. The trial judge rejected her contentions on the grounds the request for declaratory relief and the claim for interference with her contractual rights are collaries to her claim for breach of contract or implied contract and falls for the same reasons those asserted claims fell. Additionally, he rejected the claims in simulation or revocation because the plaintiff was not a creditor of Mr. Schwegmann. Counsel for the plaintiff makes little or no direct comment relative to these rulings in her brief. In our view, the trial judge's ruling was proper.
CONCLUSION
After a careful review of the record, the arguments of counsel, and the trial judge's ruling, we cannot say the trial judge erred in his findings, his rulings or in his determination and application of the laws of Louisiana to the record before us. Paramount in the review of the petition is the recognition it was molded in conformity with the distinctions drawn by the Supreme Court of the State of California in Marvin v. Marvin, 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976). But also paramount in the review of the plaintiff's deposition is the recognition that her testimony does not produce a factual setting consistent with the allegations of the petition. Furthermore, we do not believe the prevalence and social acceptance of non-marital sexual relationship at this time is justifiable grounds to abandon the Louisiana concept of the unlawfulness of a concubinage relationship.
To equate the non-marital relationship of concubinage to a marital relationship is to do violence to the very structure of our civilized society. Without the family, the State cannot exist and without marriage the family cannot exist. Thus, aside from religious or moralistic values, the State is justified in encouraging the legitimate (marriage) over the illegitimate (concubinage), for to do otherwise is to spread the seeds of destruction of the civilized society.
Unwed cohabitors involved in concubinage relationships have voluntarily chosen not to marry and they should not expect to receive the civil effects flowing by virtue of a marital state. In the absence of ceremonial marriage, in order to discourage the relationship, the State has not established, for a male and female who cohabit, statutory obligations of fidelity, support and assistance, nor a statutory recognition of a right to support or to assistance upon termination of the relationship. As the Louisiana courts have previously stated, discouraging the establishment of a sexual relationship without ceremonial marriage is in the interest of protecting the moral fabric of society and its preservation against those who flout its standards and values. See Succession of Battiste, 145 So.2d 668 (4th Cir.1962) and Texada v. Spence, 166 La. 1020, 118 So. 120 (1928).
Accordingly, the judgment of the trial court is affirmed and the case remanded to the trial court to proceed on the merits of the plaintiff's claim for compensation for business services. All costs of the appeal to be borne by the plaintiff.
AFFIRMED AND REMANDED.
NOTES
[1] Other defendants were Mr. Schwegmann's children, John F. Schwegmann and Melba Schwegmann, and various corporate entities through which Mr. Schwegmann's business affairs were conducted.
[2] In her brief, counsel for Ms. Blackledge urges arguments relative to the trial judge's dismissal of a motion to enforce an alleged settlement and a motion to disqualify the defendants' lawyers. These interlocutory orders were issued on the same date as the judgment on the motion for summary judgment. The plaintiff made no application for supervisory writs and her motion for appeal was restricted to the judgment on the motion for a summary judgment, therefore, these orders are not before us on this appeal.
[3] Title XI of Book III of the Louisiana Civil Code of 1970 OF. Partnership, previously consisting of Articles 2801 to 2890, was revised, amended and re-enacted by Acts 1980, No. 150, effective January 1, 1981. Articles 2829 thru 2834, concerning a universal partnership, which were in effect at the time the alleged agreement was confected and this suit was filed, were repealed by Act 150 of 1980.